FILED
COURT OF APPEALS
DIVISION II

2013 DEC 31 AM 9: 15

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SPACE AGE FUELS, INC., | No. 44195-1-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, | PUBLISHED OPINION |
| Respondent. | |

WORSWICK, C.J. — Space Age Fuels, Inc., an Oregon corporation, appeals summary judgment dismissing its claim for a refund of business and occupation tax payments. Space Age argues that the dormant commerce clause[1] prohibits Washington from taxing its activities because they lack a substantial nexus with Washington. We disagree and affirm.

---

[1] The "dormant" commerce clause is implied by article I, section 8, clause 3 of the United States Constitution. *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992).

FACTS

Space Age Fuels, Inc. is a retail and wholesale seller of fuel. Space Age is incorporated in Oregon and maintains its principal place of business in Clackamas, Oregon. Although all of its retail fuel stations are in Oregon, approximately 40 of its wholesale customers are in Washington.

Upon a wholesale customer's request, Space Age quotes fuel prices via telephone, fax, or email. Once it receives an order, Space Age delivers fuel to wholesale customers using vehicles it owns and operates.[2]

Because delivery is "another profit center," Space Age marks up its fuel prices to account for delivery costs. Clerk's Papers (CP) at 297. Thus, Space Age charges more for deliveries made at longer distances. Before transferring fuel from its delivery vehicle into a customer's storage tank, a Space Age employee will "stick the tank," i.e., measure its contents to ensure the tank can hold the fuel. When Space Age uses specialized vehicles to pump fuel into aboveground storage tanks for some customers, it charges more for this extra pumping service.

But Space Age's activities in Washington are limited. Space Age makes "no effort to secure new customers for its fuel in Washington" because it believes its wholesale customers base their purchases solely on price. CP at 54. Thus, no Space Age employees have visited Washington to solicit sales or assess a customer's needs. Further, Space Age does not own or lease any real property in Washington, and it has no Washington-based employees or assets. Instead, Washington customers contact Space Age.

---

[2] Rarely, Space Age delivers fuel by common carrier.

No. 44195-1-II

The Washington State Department of Revenue audited Space Age's books and records for the period between January 1, 2004, and June 30, 2007. During that time, Space Age grossed over $48 million from 1,675 recorded sales to wholesale customers in Washington.[3] Between July 1, 2005, and the end of the audit period, Space Age's vehicles drove 141,491 miles on Washington roadways.

The Department determined that Space Age owed $235,834 in unpaid business and occupation (B&O) taxes for its wholesaling activities in Washington during the audit period.[4] The Department also assessed interest and penalties.[5]

Space Age paid the tax assessment and then filed a claim for a refund in superior court, arguing that (1) there was no substantial nexus between Space Age and the State of Washington; and (2) without such a nexus, imposition of the B&O tax violated the dormant commerce clause. On cross motions for summary judgment, the trial court granted the Department's motion, denied Space Age's motion, and dismissed its refund claim.

Space Age sought direct review in our Supreme Court. But our Supreme Court transferred the case to us. Order, *Space Age Fuels, Inc. v. State*, No. 86972-3 (Wash. Oct. 30, 2012).

---

[3] The number of actual deliveries "would likely be much higher" than the number of recorded sales because Space Age's books used a single sales entry to record all deliveries to a single customer in a given month. CP at 81.

[4] The B&O tax is imposed on "the act or privilege of engaging in business activities." Former RCW 82.04.220 (1961). After the audit period, the legislature amended RCW 82.04.220 to, inter alia, incorporate the constitutional requirement of a "substantial nexus with this state." LAWS OF 2010, 1st Spec. Sess., ch. 23, § 102; *see also* LAWS OF 2011, 1st Spec. Sess., ch. 20, § 101.

[5] The Department further assessed nominal amounts of unpaid retail sales taxes, retail B&O taxes, and hazardous substance taxes. Space Age has not sought refunds of these amounts.

3

ANALYSIS

Space Age argues that the trial court erroneously granted the Department's motion for summary judgment because the dormant commerce clause prohibits the Department from taxing Space Age. We disagree.

We review an order granting summary judgment de novo and engage in the same inquiry as the trial court. *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 280-81, 242 P.3d 810 (2010). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

Two clauses of the United States Constitution limit a state's power to tax interstate commerce: (1) the Fourteenth Amendment due process clause and (2) the "dormant" commerce clause implied by article I, section 8, clause 3. *Quill Corp. v. North Dakota*, 504 U.S. 298, 301, 305, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992). Under the due process clause, an out-of-state taxpayer must have sufficient minimum contacts with the taxing state such that taxation "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (internal quotation marks omitted). Space Age does not challenge its tax liability on due process grounds.

Next, the dormant commerce clause prohibits a state from discriminating against or unduly burdening interstate commerce. *Quill*, 504 U.S. at 312. Yet a state may tax interstate commerce if the tax (1) applies to an activity having a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly

4

related to the services provided by the state. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). Space Age contests only the first element: it denies having a substantial nexus with Washington.[6]

Whether an out-of-state company has a substantial nexus with Washington is a question of law reviewed de novo. *See Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 842, 246 P.3d 788, *cert. denied*, 132 S. Ct. 95 (2011). Taxes are presumed valid, and the company bears the burden of showing that a substantial nexus does not exist. *Lamtec*, 170 Wn.2d at 843.

A substantial nexus exists when a company's activities in Washington are both substantial and significantly associated with its ability to establish and maintain a market in Washington for its sales. *Tyler Pipe Indus., Inc. v. Wash. Dep't of Revenue*, 483 U.S. 232, 250, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987); *Lamtec*, 170 Wn.2d at 851. A company's physical presence in Washington can establish a substantial nexus. *Lamtec*, 170 Wn.2d at 845; *see Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 562, 97 S. Ct. 1386, 51 L. Ed. 2d 631 (1977). Further, periodic visits can create a physical presence in Washington. *Lamtec*, 170 Wn.2d at 846. Thus, a company may have a physical presence in Washington even though it lacks a "brick and mortar address within the state." *Lamtec*, 170 Wn.2d at 851; *see Standard*

---

[6] Citing *Quill*, 504 U.S. at 313 & n.7, Space Age asserts that the dormant commerce clause's requirement of a substantial nexus is more stringent than the due process clause's minimum contacts requirement. Space Age then calls our attention to *Miller Brothers Co. v. Maryland*, 347 U.S. 340, 74 S. Ct. 535, 98 L. Ed. 744 (1954), a case in which taxation of an out-of-state company violated due process. In *Miller Brothers*, a Delaware company's occasional delivery of products to Maryland customers via its own vehicles did not establish minimum contacts with Maryland. 347 U.S. at 345. But given more recent developments in the law of minimum contacts, "the continued authority of *Miller Brothers* is in considerable doubt." *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 426, 665 N.E.2d 795, *cert. denied*, 519 U.S. 866 (1996); *see Quill*, 504 U.S. at 307-08 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)).

No. 44195-1-II

*Pressed Steel Co. v. Wash. Dep't of Revenue*, 419 U.S. 560, 562, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975).

Space Age's regular deliveries establish its physical presence in Washington. *See Lamtec*, 170 Wn.2d at 845-46. These deliveries are substantial because Space Age's recorded sales to Washington customers occurred, on average, more than once per day during the audit period. In addition, Space Age's vehicles drove extensively on Washington roads while delivering over $48 million of fuel to Washington customers.

Further, Space Age conducts substantial activities in Washington because, as a wholesale fuel distributor, Space Age sells *both* the commodity of fuel *and* the service of delivery to customers in Washington. The commodity sales occur in Washington when Space Age employees stick the tank and transfer fuel into its Washington customers' storage tanks. *See* RCW 82.04.040(1). Space Age charges more to make deliveries at longer distances, and it also charges more to pump fuel into aboveground tanks when necessary.

Both Space Age's physical presence in Washington and its delivery activities are significantly associated with its ability to establish and maintain a market in Washington for its sales. *Tyler Pipe*, 483 U.S. at 250. Because a substantial nexus exists, the Department's B&O tax assessment did not violate the dormant commerce clause.[7] *Complete Auto*, 430 U.S. at 279.

Arguing to the contrary, Space Age contends that delivery alone cannot establish a substantial nexus. In support of this contention, Space Age relies on (1) the example given in an

---

[7] We reject Space Age's assertion that this analysis "fails to acknowledge the difference between Due Process Clause analysis and Commerce Clause analysis." Reply Br. of Appellant at 17. We do not base our decision on whether Space Age has purposefully directed its activities at Washington residents so as to establish minimum contacts with this state. *See Quill*, 504 U.S. at 308.

interpretive rule published by the Department, (2) Space Age's own assertion that nexus-creating activities are activities designed to generate sales, and (3) the reasoning supporting the bright-line test applied in *Quill*, 504 U.S. 298.

A.     *The Department's Interpretive Rule*

Arguing that delivery alone cannot establish a substantial nexus, Space Age asserts that the Department took the same view when promulgating an interpretive rule, WAC 458-20-193(11).[8] But this assertion lacks relevance to the issue before us for three reasons.

First, an interpretive rule such as WAC 458-20-193(11) is "not binding on the courts at all."[9] *Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 447, 120 P.3d 46 (2005). Second, we give no deference to an agency's interpretative rule unless it reasonably interprets an ambiguous statute that the legislature has charged the agency with administering and enforcing. *Edelman v. State ex rel. Pub. Disclosure Comm'n*, 152 Wn.2d 584, 590, 99 P.3d 386 (2004). Even if WAC 458-20-193(11) interpreted the dormant commerce clause—and it does not do so—we would not defer to its interpretation because the Department does not administer or enforce the commerce clause of the United States Constitution.

---

[8] WAC 458-20-193(11)(a) provides:

> Company A is located in California. It sells machine parts at retail and wholesale. Company B is located in Washington and it purchases machine parts for its own use from Company A. Company A uses its own vehicles to deliver the machine parts to its customers in Washington for receipt in this state. The sale is subject to the retail sales and B&O tax if the seller has nexus, or use tax if nexus is not present.

[9] WAC 458-20-193(11) is an interpretive rule because (1) its violation does not subject a person to a penalty and (2) it merely "sets forth the agency's interpretation of statutory provisions it administers." RCW 34.05.328(5)(c)(ii).

Third, WAC 458-20-193(11) illustrates only *what* taxes apply and *who* must pay them in interstate transactions. In the example of WAC 458-20-193(11)(a), an out-of-state seller uses its own vehicles to deliver products to an in-state buyer. The *seller* pays Washington *sales and B&O taxes* "if the seller has nexus"; otherwise, the in-state *buyer* pays Washington *use taxes*.[10] WAC 458-20-193(11)(a). Thus WAC 458-20-193(11)(a) shows merely that a substantial nexus is necessary to tax an out-of-state seller; it does not attempt to show whether a substantial nexus exists given a particular set of facts. We do not consider this provision further.

B.    *Activity Designed To Generate Sales*

Space Age next contends that a substantial nexus can exist *only* by virtue of an activity that is "designed to generate sales." Br. of Appellant at 22. Space Age then attempts to distinguish its activities from the nexus-creating activities in *Tyler Pipe, Standard Pressed Steel,* and *Lamtec.* We disagree because generating sales is not the touchstone of all nexus-creating activity. As stated above, a substantial nexus exists when a company's activities in Washington "are significantly associated with [its] ability to establish and maintain a market in this state for the sales." *Tyler Pipe,* 483 U.S. at 250 (internal quotation marks omitted).

In *Lamtec,* an out-of-state company sent agents to Washington about two or three times per year to meet with major customers. 170 Wn.2d at 841. The agents shared information about the company's insulation and vapor barrier products, but they did not solicit sales directly. 170 Wn.2d at 840-41. Nonetheless, our Supreme Court held that the agents' visits created a substantial nexus because the visits were significantly associated with the company's ability to

---

[10] Sales and B&O taxes are paid to the Department by the seller. *See* RCW 82.04.220; RCW 82.08.050. In contrast, use taxes are paid by the buyer. *See* RCW 82.12.020.

establish and maintain a market for its products in Washington. 170 Wn.2d at 851. Whether the agents' visits generated sales was not determinative.

Likewise in *Standard Pressed Steel*, a Pennsylvania company sold nuts and bolts to Washington customers, principally Boeing. 419 U.S. at 561. The company had a single Washington employee, and the employee operated out of his home. 419 U.S. at 561. The employee, along with a group of engineers who periodically traveled to Washington, consulted with Boeing about its needs and addressed any difficulties with the company's nuts and bolts. 419 U.S. at 561. However, the employee did not take Boeing's orders, accept its payments, or deliver nuts and bolts. 419 U.S. at 561. Yet the Court held that a B&O tax assessment did not violate the dormant commerce clause because the company's Washington employee "made possible the realization and continuance of valuable contractual relations" between the company and its Washington customers. 419 U.S. at 562.

*Lamtec* and *Standard Pressed Steel* take a broader view of establishing and maintaining a market than Space Age's narrow emphasis on generating sales would allow. Attempting to distinguish these cases as well as *Tyler Pipe*, Space Age appears to argue that (1) business relationships are essential to generating sales and (2) Space Age has no business relationship with any of its 40 Washington customers, each of whom buys fuel on the exclusive basis of its

price.[11] But Space Age fails to account for *Lamtec*'s statement that a company's physical presence can establish a substantial nexus. 170 Wn.2d at 845. Moreover, Space Age ignores the extent to which its deliveries make possible "the realization and continuance" of sales to its customers. *Standard Pressed Steel*, 419 U.S. at 562. Space Age's argument is unpersuasive.

C.     *The Quill Bright-Line Test*

Lastly, Space Age argues that its deliveries did not create a nexus under the reasoning of *Quill*, 504 U.S. 298. We disagree.

In *Quill*, the United States Supreme Court reaffirmed its prior holding that "a vendor whose only contacts with the taxing State are by mail or common carrier lacks the 'substantial nexus' required by the Commerce Clause." 504 U.S. at 311, 317 (citing *Nat'l Bellas Hess, Inc. v. Dep't of Revenue of Ill.*, 386 U.S. 753, 87 S. Ct. 1389, 18 L. Ed. 2d 505 (1967), *overruled on other grounds by Quill*, 504 U.S. at 308). Thus *Quill* preserved the "safe harbor" protecting the mail-order industry from state sales taxes since *Bellas Hess*. 504 U.S. at 315-16.

Space Age asserts that it would fall within this safe harbor if it had made its deliveries by common carrier. It then argues, "Given the Commerce Clause's structural concerns about the effects of state regulation on the national economy, there is no reason for the constitutionality of the tax to turn on the method by which the fuel is delivered." Br. of Appellant at 25. But this

---

[11] Unlike the companies selling specialized products in *Tyler Pipe*, *Standard Pressed Steel*, and *Lamtec*, Space Age sells a commodity: a commercial good (namely fuel) for which the quality does not vary from one source to another. Thus it is plausible that business relationships, advertising, and branding do not generate Space Age's sales. But Space Age's president stated that delivery is "another profit center," i.e., a service for which Space Age charges its customers. CP at 297. That statement belies Space Age's factual assertion that its customers make purchases based *solely* on price. In other words, Space Age's wholesale customers buy its fuel partly because Space Age delivers it to them.

argument contradicts *Quill*. *Quill* fully considered the commerce clause's structural concerns and maintained a bright-line rule.[12] 504 U.S. at 312, 315. That rule is unavailing to Space Age because it delivered fuel in its own vehicles, not by common carrier.[13]

Similarly unavailing is the Board of Tax Appeals's recent decision finding no substantial nexus in *Sage V Foods, LLC v. Dep't of Revenue*, No. 11-704, 2012 WL 4794242 (Wash. Bd. of Tax Appeals Aug. 31, 2012). In *Sage*, an out-of-state company engaged a common carrier to deliver its food product to Washington customers, using rail cars leased by the out-of-state company. *Sage*, 2012 WL 4794242 at *7-8. But unlike the company in *Sage*, Space Age did not deliver its fuel by common carrier.

Each of Space Age's arguments fails. Because Space Age has a substantial nexus with Washington, the Department's B&O tax assessment did not violate the dormant commerce clause.

Affirmed.

_____
Worswick, C.J.

We concur:

_____
Hunt, J.

_____
Johanson, J.

[12] *Quill* recognized, "Like other bright-line tests, the *Bellas Hess* rule appears artificial at its edges . . . . This artificiality, however, is more than offset by the benefits of a clear rule." 504 U.S. at 315.

[13] Because Space Age does not come within the safe harbor of *Quill* and *Bellas Hess*, we do not address the Department's assertion that the safe harbor protects a company *only* from sales and use taxes, and not from *all* taxes including the B&O tax. *See Lamtec*, 170 Wn.2d at 848-49.