[No. 31681.    *En Banc.*    May 15, 1951.]

THE B. F. GOODRICH COMPANY, *Appellant,* v. THE STATE OF
WASHINGTON *et al., Respondents and Cross-appellants.*[1]

*Hile, Hoof & Shucklin,* for appellant.

*The Attorney General* and *C. John Newlands, Assistant,*
for respondents and cross-appellants.

[1]Reported in 231 P. (2d) 325.

ROBINSON, J.—This action was brought to enjoin the recovery of certain business and occupation taxes assessed by the tax commission of the state of Washington. Appellant, The B. F. Goodrich Company, contends that the assessment of these taxes is in violation of the commerce clause of the United States constitution.

Appellant, a New York corporation qualified to do business in the state of Washington, is a manufacturer and wholesaler of various products. It engages in no manufacturing within this state, but its local selling activities are numerous and varied. Those sales, the gross receipts from which, appellant urges, have been improperly included within the measure of its business and occupation tax, may be divided into five general classifications, as follows:

Class A sales: These are sales by appellant's Automotive, Aviation, and Government Sales Division, which sells products to manufacturers, not for consumption, but for incorporation into articles manufactured by the purchasers, for example, fuel tanks for aircraft. This division maintains in Washington an office, a manager, and a secretary. The division manager solicits orders from Washington purchasers. These orders are received and acknowledged by him, and forwarded to appellant's main office at Akron, Ohio. Final acknowledgment and approval is made at Akron and transmitted to the Washington division office which, in turn, notifies the customer. The merchandise is shipped directly to the purchaser, f.o.b. Akron.

Class B sales: These include sales by the Tire Replacement Sales Division, which handles sales of various automotive and domestic accessories for the replacement trade, as distinguished from sales of similar products to manufacturers for incorporation into products which they, in turn, sell; and sales by the Industrial and General Products Division, which sells items such as industrial belting, either through distributors or directly to consumers. The Tire Replacement Sales Division has nine salesmen, ten office employees, seven staff members, one warehouseman, and one hundred and one other employees in Washington. The

products it handles are marketed through eleven retail stores owned and operated by appellant, and also through franchise dealers and distributors to whom wholesale sales are made. The Industrial and General Products Division maintains in Washington eight employees, including three salesmen. Both these divisions operate offices in Washington, and each maintains a warehouse containing a considerable inventory.

Those sales, denominated class B, are initiated when orders are solicited and obtained from Washington purchasers by salesmen operating out of the Washington division offices, or when orders are received by these offices directly from the Washington purchasers. The orders are accepted in Washington and sent to appellant's Portland, Oregon, warehouse for filling. The merchandise is shipped directly to the purchasers, f.o.b. Portland.

Class C sales: These are also sales made by the Tire Replacement Sales and Industrial and General Products Divisions. Orders for merchandise not available in Washington are mailed by the Washington purchaser directly to the Portland office. If the purchaser has previously obtained a dealer franchise and credit approval for such sales from the proper Washington division office, and notice thereof has been sent to Portland, the orders are accepted and filled in Portland. If no such franchise or credit approval has been granted, the orders are referred to the Washington division office in order that this may be done. If the Washington office grants such franchise and credit approval, the merchandise is shipped directly to the purchaser, f.o.b. Portland.

Class D sales: These are sales by the Hood Rubber Division, which is a complete operating unit, managing its own manufacturing and sales operations. It sells such articles as rubber and rubber-soled canvas footwear, flooring, battery boxes, and coated fabrics. In Washington, this division has sixteen employees, including salesmen, and it maintains a footwear sales office and warehouse in Seattle. Orders for footwear, of a type not warehoused in Washington, are solicited and obtained from Washington purchasers by sales-

men operating out of the Washington division office, or they are received by this office directly from the Washington purchasers. After the approval of the purchasers' credit in Washington, the orders are sent to the main office of the Hood Rubber Division in Watertown, Massachusetts, where they are accepted, if the merchandise is available. The merchandise is shipped directly to the purchaser, f.o.b. Watertown.

Class E sales: These are also sales made by the Hood Rubber Division and involve only flooring material. It is alleged in the complaint, and admitted by the answer, that solicitation of accounts is made for this product by mail or by salesmen reporting to Watertown only. It is further alleged and admitted that such salesmen have no connection with the Seattle office of the Hood Rubber Division; that no salesmen or sales offices concerned with this product are maintained in Washington; and that no stock or inventory of flooring material is maintained here. Orders for the product are mailed by Washington purchasers directly to a San Francisco office, where such merchandise is stocked, or to the main division office at Watertown. The merchandise is shipped directly to the purchaser, f.o.b. Watertown or San Francisco, as the case may be.

Class F sales: These are a special class of sales made by the Hood Rubber Division, pursuant to a contract negotiated between the main division office at Watertown, and the home office of the J. C. Penney Company at New York City. Orders are placed by the Washington outlets of the J. C. Penney Company with their New York office, which, in turn, transmits the orders to the Watertown office of the Hood Rubber Division. The merchandise is shipped directly to the J. C. Penney Company outlets in Washington as designated by the New York office. Shipments are made f.o.b. Watertown.

The trial court concluded that the gross proceeds from the sales in classes A, B, C, D, and E were constitutionally includable within the measure of the business and occupation tax payable by The B. F. Goodrich Company. From this

portion of the judgment, the company has appealed. The court further held that the gross proceeds from the sales in class F could not properly be included within the tax assessment, and enjoined the tax commission from collecting any taxes based on sales in this class. From this portion of the judgment, the tax commission has cross-appealed.

The statute, by authority of which it is sought to include within the measure of appellant's' tax the proceeds of these sales, is Rem. Rev. Stat. (Sup.), §§ 8370-4 [P.P.C. § 965-1] *et seq.,* as amended by chapter 5, Session Laws of 1950, Extraordinary Session. In pertinent part, this statute reads as follows:

"Section 4. From and after the first day of May, 1935, there is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows: . . .

"(b) Upon every person . . . engaging within this state in business as a manufacturer; as to such persons the amount of the tax with respect to such business shall be equal to the value of the products, including by-products, manufactured, multiplied by the rate of one-quarter of one per cent;

"The measure of the tax is the value of the products, including by-products, so manufactured regardless of the place of sale or the fact that deliveries may be made to points outside the state; . . .

"(e) Upon every person . . . engaging within this state in the business of making sales at wholesale; as to such persons the amount of tax with respect to such business shall be equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one per cent; . . .

"Section 6. . . . persons taxable under paragraphs . . . (e) . . . shall not be taxable under paragraphs . . . (b) . . . with respect to extracting or manufacturing of the products so sold."

As amended in 1943, this statute provided that persons taxable as manufacturers should not be taxable as wholesalers. Rem. Supp. 1943, § 8370-6. As so written, we held that it marked an unconstitutional discrimination against

interstate commerce, in that it levied a tax upon wholesale activities of those engaged in such commerce, while exempting those who performed the same taxable act, to wit, the sale at wholesale, if they manufactured in the state of Washington. *Columbia Steel Co. v. State,* 30 Wn (2d) 658, 192 P. (2d) 976; *Weyerhaeuser Sales Co. v. State Tax Commission,* 30 Wn. (2d) 947, 192 P. (2d) 979. In an attempt to cure this defect, the legislature, in its extraordinary session of 1950, rewrote the statute in the form quoted above, so that it now lays a tax equally upon all those selling at wholesale within the state, but further provides that those who are taxed as wholesalers shall not be taxed as manufacturers. The procedure for exemption of those who perform both the taxable acts of manufacture and sale has thus been exactly reversed; the local manufacturer-wholesaler, instead of being exempt from tax as a wholesaler, is instead exempt as a manufacturer.

■ Although respondents plainly regard this change as purely verbal (it may well be; but the cases in this field often turn, unfortunately, on just such verbal niceties), they also assert that it has rendered the statute invulnerable to any attack that an out-of-state manufacturer who sells his product within the state may direct against it on the ground that it unconstitutionally discriminates against him. With this position we agree. All those who sell at wholesale within this state are now taxed equally upon that activity regardless of whether they manufacture in Washington or elsewhere. Because some other state might exercise its undoubted right to tax the privilege of manufacture with respect to goods ultimately sold in Washington (*American Mfg. Co. v. St. Louis,* 250 U. S. 459, 63 L. Ed. 1084, 39 S. Ct. 522; see *Freeman v. Hewit,* 329 U. S. 249, 91 L. Ed. 265, 67 S. Ct. 274), this state need not forego its right to tax the business of selling those goods. Each state must derive its revenues from what goes on within its own borders. And if Washington's statute exempts local manufacturers from paying their tax as manufacturers, providing they also pay it as sellers, that, as appellant admits, can be of no concern to one who manufactures out of the state.

Appellant engages in but one local taxable activity—selling—and as to this it is now taxed on a parity with all others who engage in like activity here. Though it be subjected to a threat of multiple taxation not, under the present statute, borne by the local manufacturer-seller, that is but an inevitable consequence of the power of the several states to tax; no constitutional question is involved. See Lockhart, Gross Receipts from Taxes on Interstate Transportation and Communication, 57 Harv. L. Rev. 40, 75, note 155; cf. *Drury The Tailor v. Jenner*, 12 Wn. (2d) 508, 122 P. (2d) 493.

But though this statute may no longer be open to the charge that it is, in the respect under consideration, discriminatory, the question yet remains of whether, as construed by the tax commission, it marks an unconstitutional levy upon interstate commerce. Article 1, section 8, of the Federal constitution, of course, gives to the Congress the power to regulate commerce among the several states; and it has been assumed that this clause restricts the states as to the manner in which they may tax an interstate business. The nature and extent of the restriction, however, remain matters of great uncertainty. In the plethora of cases which have arisen on the subject within recent years, the United States supreme court has been concerned with striking a balance between two conflicting principles: (1) That interstate commerce should be protected from undue interference by state taxation, and (2) that the commerce clause is nevertheless not intended to allow such commerce to escape paying its way. In resolving these principles, the court has not always been doctrinally consistent, and at least from the time (1938) of *Western Live Stock v. Bureau of Revenue*, 303 U. S. 250, 82 L. Ed. 823, 58 S. Ct. 546, 115 A. L. R. 944, the relevant cases have been confusing and contradictory in rationale. Although some knowledge of the historical background of the problem is indispensable to a proper understanding of it, we shall not attempt to review these cases here. A brief, but scholarly, analysis, with reference to most of the important sources, both ju-

dicial and academic, which bear upon the matter, may be found in the opinion of Judge Charles E. Clark in *Spector Motor Service v. O'Connor,* 181 F. (2d) 150. Suffice it to say that, at the time the present case was argued before us, there was no certainty as to what test the court would follow in determining the constitutionality of the application of a gross receipts tax, laid upon the privilege of doing business, to proceeds of sales of the type here involved.

On February 26, 1951, however, the court handed down its opinion in *Norton Co. v. Department of Revenue of Illinois,* 340 U. S. 534, 95 L. Ed. 517, 71 S. Ct. 377, a case which, on its facts, strongly resembles the case at bar. Both parties herein have recognized the importance of this decision to the present inquiry, and both have submitted supplemental briefs containing their views as to its effect. As we deem it controlling, we shall discuss it here in some detail.

From the report of the case in the state court (*Norton Co. v. Department of Revenue,* 405 Ill. 314, 90 N. E. (2d) 737), as well as from the supreme court decision, it appears that the facts in this case were as follows: The Norton Company was a Massachusetts corporation, engaged in the business of manufacturing and selling abrasive machines and supplies. Its main office and plant were located at Worcester, Massachusetts. Under consent from the state of Illinois to do business therein, it operated a branch office and warehouse in Chicago from which it made local sales at retail. No salesmen were employed by the company in Illinois, but it did have a group of engineers available to consult with prospective customers as to their needs. These engineers did not solicit or take orders for goods.

Although neither opinion is explicit on the point, careful reading of both appears to indicate that, aside from sales made out of the Chicago inventory to customers in Illinois (which were not involved in the case), the company made at least four types of sales to Illinois residents: (1) sales where the order was received at Chicago and forwarded to the home office at Worcester for filling, with shipment being made from there to Illinois customers via the Chicago

office; (2) sales where the order was received at Chicago and forwarded, with shipment being made direct from Worcester to the Illinois customers; (3) sales where the order was sent directly to Worcester, with shipment being made to the Illinois customers via the Chicago office; and (4) sales where the order was sent directly to Worcester, with shipment being made directly to the Illinois customer. All shipments were made f.o.b. Worcester.

Illinois sought to reach the proceeds of all of these sales by virtue of the provisions of its retailers' occupation tax act, which laid a tax "upon persons engaged in the business of selling tangible personal property at retail in this state." Ill. Rev. Stat., chapter 120, § 441. The amount of the tax was measured by the gross receipts from sales so made. The question raised was whether or not such a tax, as applied to the sales described above, offended the commerce clause. The supreme court of Illinois held that it did not, and that Illinois might properly treat all of these transactions as taxable. The United States supreme court affirmed, but with one significant modification; income from sales in the fourth class where the order was sent directly to Worcester, with shipment being made directly to the Illinois customer, was held not subject to the tax.

The variance in the two opinions is due to the different theories with which the two courts approached the problem. Disregarding the portions of the Illinois opinion which attempt to rationalize or distinguish previous holdings, it is apparent that the court in that case was much influenced by a firm conviction that a state should have the power to tax all activities carried on within its borders provided that it does not "erect barriers which place an out-of-state business at a disadvantage in competing locally within the state." Not to permit the state to reach the interstate retailer would give him, as the court said, "an unfair advantage over other retail establishments in the same trade"; and, in fact, the court thought, recent supreme court decisions, which it enumerated, had indicated that "immunity to taxes by an interstate retailer is limited to those who merely solicit orders and do not maintain outlets in the

taxing state," if, indeed, even so limited a group as this was entitled to such immunity.

The majority of the United States supreme court did not believe that the commerce clause permitted the states to go so far. It agreed that, where a corporation has gone into a state to do local business by state permission, and has set up an office which performs service helpful to its competition for local trade, it may be taxed like any other vendor for sales made in connection with that business. But this, the court held, does not prevent its being tax-free with respect to sales separate and distinct from its local business; though the burden is on the taxpayer to show this dissociation, where it is demonstrated, the sales involved are interstate commerce, and entitled to the same immunity from state taxation as if the corporation had never established an office within the borders of the state.

Three judges, dissenting, took the view that such a corporation should be taxable even for that portion of its business carried on entirely independently of the activities of its local office. They said, speaking through Mr. Justice Clark:

"In maintaining a local establishment of such magnitude, petitioner has adopted the label of a home-town merchant. After it has received the manifold advantages of that label, we should not give our sanction to its claim made at tax-paying time that with respect to direct sales it is only an itinerant drummer."

This view, obviously motivated by the same policy considerations which had actuated the Illinois court, did not, however, prevail. The majority held that, in the absence of a showing that the services rendered by the Chicago office were not decisive factors in establishing and holding the Illinois market, the state court's judgment crediting that office with the income from all sales that utilized it, either in receiving the order or distributing the goods, was permissible. But it also held that income from orders sent directly to Worcester by the customer, with shipment made directly to him in return, was not reasonably attributable to the local business. Such commerce was "interstate in

character," and, in consequence, income resulting from it could not be reached by the Illinois tax.

For our purposes, the crucial sentence in the majority opinion, and the one which sets forth the test we must apply in deciding this case, is the following:

"Although the concern does not, by engaging in business within the State, lose its right to do interstate business with tax immunity, *Cooney v. Mountain States Telegraph Co.,* 294 U. S. 384, it cannot channel business through a local outlet to gain the advantage of a local business and also hold the immunities of an interstate business."

■ It seems clear that, under this test, the sales made by The B. F. Goodrich Company in classes A, B, and D are constitutionally taxable. In all of these sales, business is channeled through the company's local outlets, and not only has appellant failed to demonstrate that the services rendered by these offices do not play a significant part in establishing and holding this market, it affirmatively appears that they do so. In this connection, *McLeod v. J. E. Dilworth Co.,* 322 U. S. 327, 88 L. Ed. 1304, 64 S. Ct. 1023, is of no assistance to appellant; for, there, the company which Arkansas sought to tax maintained no local office within Arkansas, but operated only through itinerant solicitors; and this fact, as the *Norton Co.* case demonstrates, is sufficient to mark a controlling distinction between the *McLeod* case and that at bar.

It seems equally apparent from the *Norton Co.* decision that the sales made in classes E and F cannot be reached by the state of Washington under this tax. It is quite true that the supreme court has, on previous occasions, used language which, broadly considered, might suggest that the sales made in class E, at least, could properly be made the subject of a tax of this kind. In *Nelson v. Sears, Roebuck & Co.,* 312 U. S. 359, 85 L. Ed. 888, 61 S. Ct. 586, 132 A. L. R. 475, and *Nelson v. Montgomery Ward & Co.,* 312 U. S. 373, 85 L. Ed. 897, 61 S. Ct. 593, the court held that Iowa could impose a *use* tax laid upon gross receipts from retail sales and collectible by the vendor on mail

orders sent by Iowa purchasers to out-of-state branches of a corporation doing business within Iowa and filled by direct shipments from these branches to the purchasers. The fact that the company's outlets within the state had not been directly involved in these sales was held to be immaterial with respect to Iowa's power to collect the tax. In the *Sears, Roebuck & Co.* case, the court said:

"Whatever may be the inspiration for these mail orders, however they may be filled, Iowa may rightly assume that they are not unrelated to respondent's course of business in Iowa. They are nonetheless a part of that business though none of respondent's agents in Iowa actually solicited or placed them. Hence to include them in the global amount of benefits which respondent is receiving from Iowa business is to conform to business facts."

But this line of reasoning was not followed in the *Norton Co.* case; only the dissent of Mr. Justice Clark invoked it; and the majority distinguished the *Nelson* cases, and similar decisions, on the ground that they involved sales or use taxes laid upon the local buyer or user, whereas the Illinois tax, like the tax with which we are here concerned, was a tax laid upon the vendor who, with respect to these sales, was in the same position as an extra-state seller upon whom Illinois had no local grip.

▮ Whatever we may think of this distinction from the standpoint of practical effect, our only concern with it here is that it has been made and must be observed. In accordance with it, we are compelled to hold that the class E sales, involving orders sent by the purchasers directly to an office out of the state, and filled by shipment direct to the purchaser, without any intervention on the part of the local office, cannot constitutionally be made the subject of the tax here involved. *A fortiori,* the class F sales, made pursuant to a contract between the home office of the J. C. Penney Company and the home office of appellant's Hood Rubber Division, with the consummation of which the local office has no concern whatever, are beyond the reach of the state's taxing power, at least with respect to this particular tax.

■ The only sales involved in the present case about which there might be some doubt under the *Norton Co.* decision, are those in class C. It will be recalled that these sales are not channeled through the local office. Orders are sent to Portland and filled there, the merchandise being shipped directly to the purchasers. However, it appears that, if no dealer franchise or credit approval has been given the purchasers, the orders are referred to the Washington division office in order that these may be granted or denied. Appellant's argument that, while a franchise and credit approval are conditions precedent to the purchase and sale of merchandise, they are unrelated to the actual purchase of merchandise by the buyer, or to the sale and delivery by the seller, is not without force. Nevertheless, this tax is "paid for the act or privilege of engaging in business activities in Washington." We only interpret the *Norton Co.* case as holding that such a tax may not be levied upon the proceeds from sales with which the local outlet had nothing to do. It is, of course, conceded that a state has the right to tax the privilege of doing local business, and, here, the Washington office unquestionably performs a service essential to the completion of the sales the proceeds of which the state seeks to tax. We are in agreement with respondent that this activity is sufficient to tie the class C sales to the Washington business of The B. F. Goodrich Company, and that Washington may consequently reach the proceeds therefrom through this tax.

Were we free to decide this case differently, we might well do so. Numerous questions must necessarily follow from the conclusions we have here reached. Does the limitation of the operative effect of this tax to what is found to be intrastate commerce actually protect interstate trade from an unjustified levy, or does it merely allow to that trade a special and unwarranted exemption which local business is not permitted to enjoy? And even if we assume that this sort of taxation, if applied to interstate commerce, would have the inhibitory effect which the supreme court has held the constitution sought to forbid, have we removed that burden when we subject receipts of certain

sales to taxation merely because they were made with the assistance of a local outlet of a corporation; while at the same time allowing those sales, made through out-of-state branches of the same company, to go tax free? Cannot it be argued that this distinction is a purely arbitrary one, with no relation whatever to the real problem, which would seem to be the economic impact of the tax, as assessed, upon commerce moving across state lines? Finally, even if this distinction be accepted as valid, what of the difficulty of drawing it in a border-line situation such as that presented by the class C sales in the instant case? The *Norton Co.* case would seem to indicate that the supreme court is splitting hairs a little further on the side of the state's power to tax than it was at the time (1918) of *Cheney Bros. Co. v. Commonwealth of Massachusetts*, 246 U. S. 147, 62 L. Ed. 632, 38 S. Ct. 295; but it also appears to demonstrate that the technique employed in that case, for distinguishing local from interstate commerce, is once again the one in vogue.

These questions, however, are by no means novel; they have often been raised, and the supreme court has often considered them, as an analysis of its cases will readily reveal. It scarcely needs be said that, with respect to matters involving the Federal constitution, we, as an inferior tribunal, must follow the pronouncements of that court no matter what our private views may be. In any event, there are few subjects in the entire field of constitutional law so elusive as that of state taxation of interstate commerce, and it would be a sanguine individual indeed who could assert that he had found the ultimate solution to a problem as complex in its ramifications as that presented here. Perhaps, Mr. Justice Black's reiterated view that only Congress is competent to dispose of the matter in all of its aspects will eventually prove to offer the soundest solution. Dissent, *Gwin, White & Prince v. Henneford*, 305 U. S. 434, 442, 83 L. Ed. 272, 59 S. Ct. 325; dissent, *J. D. Adams Mfg. Co. v. Storen*, 304 U. S. 307, 316, 82 L. Ed. 1365, 58 S. Ct. 913; concurring opinion, *Northwest Airlines v. Minnesota*, 322 U. S. 292, 301, 88 L. Ed. 1283, 64 S. Ct. 950.

We may note in closing that appellant has submitted a memorandum concerning the very recent case of *Spector Motor Service, Inc. v. O'Connor*, 340 U. S. 602, 95 L. Ed. 573, 71 S. Ct. 508. There, Connecticut's business tax act, which provided for a franchise tax, measured by net income, upon all corporations doing business within the state, was held unconstitutional as applied to a carrier whose business was entirely interstate. We shall not analyze this case in detail, for the situation presented to the court, though it involved the basic problem of the power of the states to tax interstate commerce, was not analogous to that presented here. The *Norton Co.* case (which the majority in the *Spector Motor Service* case did not, apparently, feel it necessary to distinguish or even to mention) still appears to us controlling upon its facts.

With the exception of its holding with respect to the sales denominated class E, the proceeds of which we hold to be not constitutionally taxable under the state's business and occupation tax, the judgment of the trial court is affirmed in its entirety. The cause will be remanded with direction to grant injunctive relief as prayed for with respect to the sales denominated class E.

ALL CONCUR.

June 26, 1951. Petition for rehearing denied.