# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

IRWIN NATURALS,                    )
                                   )    No. 73966-2-I
            Appellant,             )
                                   )    DIVISION ONE
    v.                             )
                                   )    UNPUBLISHED OPINION
STATE OF WASHINGTON,               )
DEPARTMENT OF REVENUE,             )
                                   )
            Respondent.            )    FILED: July 25, 2016

SPEARMAN, J. — Irwin Naturals (Irwin) is a California company that sells wholesale and retail nutritional supplements to Washington consumers. Irwin disputes the Department of Revenue's (DOR) assessment of a Business and Occupation (B &O) and Retail Sales Tax (sales tax) on its retail sales in the State of Washington for the period from 2002 through 2009.[1] Irwin paid the tax and brought an action to refund the amount paid, claiming that the tax violated the commerce clause of the United States Constitution because the retail sales were dissociated from its in-state wholesale activities. The trial court disagreed and granted summary judgment in DOR's favor. Irwin appeals. We affirm.

---

[1] Irwin does not contest the taxes assessed on its wholesale sales.

FACTS

Irwin Naturals is a corporation with its principal place of business in Los Angeles, California. Irwin is in the business of developing, marketing, and selling retail and wholesale nutritional products. From 2002 through 2009, Irwin made wholesale sales to retailers and distributors in Washington. During this time, Irwin invested considerable resources into its store presence in Washington. Senior company employees spent a considerable amount of time in the state. They participated in new item presentation, category review, promotional planning, educating sales staff and trade show exhibitions. Irwin also engaged four marketing firms to aid in marketing its products in Washington. The firms engaged in a wide variety of activities with Irwin's wholesale customers, such as soliciting sales, receiving product orders, attending retailer shows on Irwin's behalf and acting as an intermediary with Irwin's retailers on promotional programs and other business matters. Irwin's products are available at Washington health food stores, as well as numerous well-known grocery, drug, and convenience store chains. According to one of its sales representatives, "people know the Irwin name." Clerk's Papers (CP) at 118.

Irwin began making retail sales to Washington residents in 2004. It characterizes its operations during the tax period as being divided into a "Retail Sales Channel" and a "Wholesale Sales Channel. Brief of Appellant at 2. According to Irwin, the retail and wholesale sales operated completely independently of each other during the period from 2004 through 2009. Irwin

2

handled all of the wholesale advertising and promotion in-house, along with the shipment of orders, the collection of payments, and the inquiries from its wholesale customers. Irwin sold wholesale products under the brands "Irwin Naturals," "Nature's Secret" and "Applied Nutrition" from 2002 through 2006. CP at 193.

All of the products sold in Washington stores listed Irwin's phone number and/or email address and website address. The website provided information about Irwin Naturals' product line and how to obtain product samples. During that period, consumers were not permitted to place online orders. It is undisputed that Irwin received phone inquiries from individuals who had purchased Irwin products from its wholesale customers. However, when it received these calls, Irwin directed the callers back to the retailer.

Irwin's strategy for developing retail sales was to offer particular products for sale through infomercials. Once the retail sales of those products peaked, Irwin planned to offer the same products to its established retailers and distributors, with the goal of maximizing revenue from both retail and wholesale sales. From 2004 through 2009, Irwin's retail sales used third party companies for its advertising and promotion, solicitation and taking of consumer orders, assembly and shipment, collection of consumer payments, and customer service inquiries.

In 2004, Irwin implemented its retail strategy with its Dual Action Cleanse product, under the brand "Cellular Research" Formulas. It marketed the product

directly to Washington consumers through infomercials. CP at 47-48. Annual retail sales of Dual Action Cleanse peaked just short of $2 million dollars in 2006. As planned, Irwin made the product available to its retailers who advertised the product through "As Seen on TV" campaigns at a much lower price. But the market did not immediately shift from retail sales to wholesale sales. In 2007 and 2008, Irwin's retail sales far exceeded those of its retailers. Irwin's annual retail revenues were approximately $1.3 million and $820,000 respectively and its annual wholesales revenues were approximately $45,000 and $91,000, respectively. By 2009, Irwin's annual revenue was still comparable to that of its retailers, approximately $635,000 and $693,000, respectively.

From 2002 through 2009, Irwin earned approximately $10 million in gross revenue from wholesale sales. From 2004 through 2009, Irwin earned approximately $5 million in gross revenue on its retail sales. DOR audited Irwin's records and issued assessments for unpaid business and occupation, retail sales, and litter taxes for 2002 through 2008. Although Irwin disputed the amount assessed on it retail sales, it paid the assessment under protest along with penalties and interest. Irwin filed this action seeking a refund for the disputed amount under RCW 82.32.180.

The parties filed cross-motions for summary judgment. The trial court rejected Irwin's argument that the tax violated the commerce clause and granted DOR's motion. It concluded that because Irwin's retail sales had a substantial

nexus to Washington, the revenues from those sales were properly subject to the State's B&O and sales tax. Irwin appeals.

## DISCUSSION

We review a decision granting summary judgment de novo, engaging in the same inquiry as the trial court and viewing the facts and inferences in the light most favorable to the non-moving party. Lamtec Corp. v. Dep't. of Revenue, 151 Wn. App. 451, 456, 215 P.3d 968 (2009). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id. The parties agree that there are no genuine issues of material fact; Irwin contends that the trial court should have granted summary judgment in its favor.

Irwin claims that its retail sales are separate and distinct from its wholesale activities in Washington. As a result, it contends that the commerce clause prohibits Washington from imposing either the B&O tax or an obligation to collect a sales tax.[2] In support of its argument concerning the B&O tax, Irwin relies primarily on Norton Co. v. Dep't of Revenue, State of Ill., 340 U.S. 534, 71 S.Ct 377, 95 L.Ed 517 (1951). That case held that an interstate seller who

_____

[2] The issue in this case concerns what is frequently referred to as the "dormant" or "negative" commerce clause. As explained in Quill Corp. v. North Dakota by and through Heitkamp, 504 U.S. 298, 309,112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), "the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. The Clause ... 'by its own force' prohibits certain state actions that interfere with interstate commerce" (quoting South Carolina State Highway Dep't v. Barnwell Brothers, Inc., 303 U.S. 177, 185, 58 S.Ct. 510, 82 L.Ed.734 (1938). All references to the commerce clause in this opinion pertain to this aspect of commerce clause jurisprudence.

engages in activities within a state can still avoid taxation on some in-state sales by showing that particular transactions are dissociated from the local business and solely interstate in nature. Id. at 537. As to the use tax, Irwin concedes Nat'l Geographic Soc. v. Cal. Bd. of Equalization, 430 U.S. 551, 97 S.Ct 1386, 51 L.Ed.2d 631 (1977), "held that the taxpayer was not permitted to dissociate its mail order sales for sales and use tax purposes." Brief of Appellant at 23. But it contends that recent U.S. Supreme Court cases interpreting the commerce clause, particularly Complete Auto Transit, Inc. v. Brady, 430 U.S. 374, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) and Quill Corp. 504 U.S. 298, have "diminished, if not tacitly overruled, the holding in National Geographic" and "ma[de] clear that dissociation applies to all tax types." Br. of Appellant at 23; 28.

DOR takes the opposite view. It contends that dissociation is no longer a viable means for an interstate seller to avoid a tax imposed by a state with which it has a substantial nexus. As to the sales tax, DOR relies primarily on National Geographic and notes Irwin's concession "that National Geographic, if still good law, forecloses its argument." Brief of Respondent at 17. But DOR also concedes, as it must, that National Geographic does not expressly apply to a B&O tax. Nonetheless, DOR argues that Irwin's reliance on Norton to contest that tax, is misplaced. According to DOR, Norton's precedential vitality has been undermined by more recent U.S. Supreme Court cases, specifically, Gen. Motors Corp. v. Washington, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964)) and Tyler Pipe Indus., Inc. v. Wash. Dep't of Revenue, 483 U.S. 232, 107 S.Ct. 2810,

97 L.Ed.2d 199 (1987) (which overruled Gen. Motors on other grounds). It also cites a recent decision by Division Two of this court which rejected an interstate seller's reliance on dissociation to contest B&O tax liability. Avnet v. State, Dep't of Revenue, 187 Wn. App. 427, 348 P.3d 1273 (2015), review granted, 184 Wn.2d 1026, 364 P.3d 120 (2016).

We conclude that an out-of-state corporation is not subject to a state tax if it can prove the sales or activity in question does not have a substantial nexus to the taxing state. For purposes of a sales tax, a substantial nexus exists if the corporation has a presence in the taxing state. For purposes of a B&O tax, a substantial nexus exists if the corporation's in-state activity aids in establishing or maintaining a market within the taxing state. We further conclude, for the reasons explained below, that Irwin has not proved that it does not have a substantial nexus with Washington and accordingly, it is liable for both taxes on its retail sales in Washington.

We first address Irwin's liability for the sales tax. We begin with a discussion of the two cases upon which the parties principally rely.

In Norton, 340 U.S. at 535, a Massachusetts corporation, sold machines and supplies in Illinois through an in-state office and warehouse in Chicago. But the record appeared to show that some sales occurred directly between a customer and the home office in Massachusetts without any intervention by the Chicago office. In these instances orders were sent by the customer directly to the home office which, in turn, sent the purchased product directly to the

7

customer. Id. at 539. Even though the Illinois tax statute specifically exempted "business in interstate commerce" as required by the commerce clause of the U.S. Constitution, the state collected a B&O tax on these direct sales as well as those that went through Norton's Chicago facilities. Id. at 535-36.

The Illinois Supreme Court affirmed the lower court's finding that the tax was validly imposed even though, as the Norton court observed, it acknowledged that "'there could be no tax on solicitation of orders only' in the State." Id. at 537 (quoting Norton Co. v. Dep't of Revenue, 405 Ill. 314, 320, 90 N.E.2d 737 (1950)). The Illinois court concluded that "the presence of [Norton's] local retail outlet, in the circumstances of this case, was sufficient to attribute all income derived from Illinois sales to that outlet and render it all taxable." Id. The Norton court explicitly rejected this reasoning because a B&O tax is a direct tax that "falls on the vendor." Id. The court concluded that the presence of a local office in the state was, by itself, insufficient to support the imposition of a B&O tax on transactions that did not involve the local office in any way. The court stated:

> Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filling, and delivery back to the buyer, it is obvious that the State of the buyer has no local grip on the seller. Unless some local incident occurs sufficient to bring the transaction within its taxing power, the vendor is not taxable.

Id., (citing McLeod v. J.E. Dilworth Co., 322 U.S. 327, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944)).

The court expressly limited its holding to a tax like a B&O tax, because it is imposed directly on the vendor. It did not express an opinion on whether in the case of a sales or use tax, the mere presence of a local office was sufficient to bring the vendor within the state's taxing power. The court did note, however, that the state's burden of establishing its right to impose a tax was "more easily" met in that context, "because the impact of those taxes is on the local buyer or user." Id. Thus, for B&O taxes, the court concluded that a corporation "can avoid taxation on some Illinois sales only by showing that particular transactions are dissociated from the local business and interstate in nature." Id. But it left for another day the showing necessary to dissociate in the case of a sales or use tax.

The opportunity to address that issue arose in Nat'l Geographic, 430 U.S. 551. There, the National Geographic Society, a District of Columbia (D.C.) corporation, maintained two offices in California that solicited advertising copy for the Society's monthly magazine. The California offices performed no activities related to the Society's operation of a mail order business for the sale of maps, atlases, globes, and books from its offices in D.C. Orders for these items were solicited by inserts in magazines or other announcements mailed to subscribers and Society members. Orders and payments were sent directly to the Society's D.C. headquarters. Purchased items were mailed directly to the consumer from the Society's D.C. or Maryland offices.

9

California law required retailers "'engaged in business in this state and making sales of tangible personal property for storage, use, or other consumption in this state' to collect from the purchaser a use tax in lieu of a sales tax imposed upon local retailers." Nat'l Geographic, 430 U.S. at 553, (quoting California Rev. & Tax Code § 6203 (West Sup. 1976)). The retailer is liable for the full amount of the tax whether collected or not. Id. The California Supreme Court held that the Society was liable for the tax and the U.S. Supreme Court accepted its appeal.

As framed by Justice Brennan, the question before the court was "whether the Society's activities at the offices in California provided sufficient nexus between the out-of-state seller appellant and the State as required by the Due Process Clause of the Fourteenth Amendment and the Commerce Clause to support the imposition upon the Society of a use-tax-collection liability. . . ." Id. at 554.

The Society argued that to impose use-tax-collection liability "there must exist a nexus or relationship not only between the seller and the taxing State, but also between the activity of the seller sought to be taxed and the seller's activity within the State." Id. at 560. It maintained that because its mail order sales were separate and distinct from the activities of its two in-state offices which involved only soliciting advertising copy, the requisite nexus or relationship was not present. The Court disagreed. It concluded that while a transactional nexus may be necessary to sustain a direct tax, like that at issue in Norton, "such dissociation does not bar the imposition of the use-tax-collection duty." Id. It was

sufficient that the Society had a "substantial presence" in the state, which included two offices that solicited approximately $1 million dollars of business annually. Id. at 556. The court held that,

> the relevant constitutional test to establish the requisite nexus for requiring an out-of-state seller to collect and pay the use tax is not whether the duty to collect the use tax relates to the seller's activities carried on within the State, but simply whether the facts demonstrate some definite link, some minimum connection, between 'the State and the person ... it seeks to tax.'

Id. at 561, (quoting Miller Bros. v. Maryland, 347 U.S. 340, 344-345, 74 S.Ct. 535, 98 L.Ed. 744 (1954)).

In light of this holding, DOR relies heavily on National Geographic to support its claim that Irwin is liable for the sales tax obligation at issue here. Irwin contends however, that the decision is not controlling. It claims the decision may be disregarded as "an anachronistic landmark" in the evolution of the Court's commerce clause jurisprudence. Reply Br. of Appellant at 10.

Irwin argues that National Geographic's commerce clause analysis fails to distinguish between the nexus necessary to satisfy the due process clause and that necessary to satisfy the commerce clause. It argues that the analysis conflates the issues and thus, fails to explicitly address commerce clause concerns regarding the free flow of commerce between the states. Instead, its conclusion that sufficient nexus was established by "some minimum connection, between 'the State and the person ... it seeks to tax'" actually addressed only due process concerns with notice and fundamental fairness. National

11

Geographic, 430 U.S. at 561, (quoting Miller Bros., 347 U.S. at 344-45). For that reason, according to Irwin, the case does not control here. Irwin cites Quill Corp., 504 U.S. 298, in support of this argument.

Quill was a Delaware corporation with offices in several states, but it owned no property in North Dakota nor did any of its employees work or reside there. Quill solicited customers for its office equipment and supply business catalogs, flyers, advertisements in national periodical and phone calls. It earned about $1 million dollars annually from approximately 3000 customers in North Dakota. Quill delivered all of its merchandise to its North Dakota customers by mail or common carrier from out-of-state locations. When Quill failed to collect a use tax from its customers, North Dakota sued, seeking an order directing Quill to collect and pay the tax. Quill disputed the state's claim, arguing that under the due process and commerce clauses of the U.S. Constitution, North Dakota did not have the power to compel it to collect the tax. After the North Dakota Supreme Court rejected Quill's arguments on both grounds, the U.S. Supreme Court accepted its appeal.

The Quill court first observed that although due process and commerce clause claims are closely related, each poses "distinct limits on the taxing powers of the States. Accordingly, while a State may, consistent with the Due Process Clause, have the authority to tax a particular taxpayer, imposition of the tax may nonetheless violate the Commerce Clause." Id. at 305 (citing Tyler Pipe Indus., 483 U.S. 232).

12

> Due process centrally concerns the fundamental fairness of governmental activity. Thus, at the most general level, the due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him. We have, therefore, often identified 'notice' or 'fair warning' as the analytic touchstone of due process nexus analysis. In contrast, the Commerce Clause and its nexus requirement are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy.

Id. at 312. These fundamental fairness concerns are met where there is "'some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax[.]'" Id. at 306 (quoting Miller Bros., 347 U.S. at 344-45).

Caselaw prior to Quill had utilized a bright line test to determine whether the due process minimum connection was established in the case of a use tax. Regardless of other factors, if the foreign corporation engaged in some form of activity within the taxing state, such as the presence of sales personnel or maintenance of local retail stores, due process was satisfied. Id. (citing Scripto, Inc. v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960). If not, imposing the duty to collect the tax was unconstitutional. Id. (citing National Bellas Hess, Inc. v. Dep't of Revenue of Ill., 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967)) (overruled by Quill only as to the due process clause analysis).

Quill noted, however, that in the 25 years since Bellas Hess, due process jurisprudence had evolved substantially:

> [W]e have abandoned more formalistic tests that focused on a defendant's 'presence' within a State in favor of a more flexible inquiry into whether a defendant's contacts with the forum made it reasonable, in the context of our federal system of Government, to require it to defend the suit in that State.

Id. at 307. Accordingly, the court overruled those cases applying a presence/non-presence bright-line test. Id. at 308. Instead, the court held that due process is satisfied if "a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State." Id. at 307. Because it was beyond question that Quill had done so in North Dakota, imposition of the duty to collect the use tax did not offend the due process clause. Id. at 308.

The Quill court then turned to the nexus necessary under the commerce clause. It noted that the commerce clause jurisprudence had likewise trended away from formalism and bright-line tests. The court cited Complete Auto, 430 U.S. 374, as a case which "emphasized the importance of looking past 'the formal language of the tax statute [to] its practical effect." Id. at 310 (quoting Complete Auto, 430 U.S. at 279). Instead, the court in that case set out a flexible four-part test to govern the validity of state taxes under the commerce clause. A tax will be sustained against a commerce clause challenge so long as it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." Complete Auto, 430 U.S. at 279.

At first blush, Quill appears to support Irwin's argument that National Geographic is no longer good law. Quill makes clear that the nexus requirements

14

of the due process clause and the commerce clause are not identical. The court

expressly disagreed with North Dakota's assertion that

> the nexus requirements imposed by the Due Process and
> Commerce Clauses are equivalent and that if, as we concluded
> above, a mail-order house that lacks a physical presence in the
> taxing State nonetheless satisfies the due process 'minimum
> contacts' test, then that corporation also meets the Commerce
> Clause 'substantial nexus' test.

Id. at 312. Quill establishes that the proper test is set forth in Complete Auto and

that for the first factor, which the parties agree is the only factor at issue in this

case, the issue is whether the tax is being applied to an activity with a substantial

nexus with the taxing state.

But in determining what constitutes a substantial nexus under the

commerce clause for purposes of a sales or use tax, Quill did not reject National

Geographic in its entirety. Instead, the court embraced "'the sharp distinction ...

between mail-order sellers with [a physical presence in the taxing] State and

those ... who do no more than communicate with customers in the State by mail

or common carrier as part of a general interstate business'" as a basis for

determining when a state could properly impose a use tax collection obligation.

Id. at 311 (quoting National Geographic, 430 U.S. at 559). In other words, the

determinative factor in National Geographic, that the Society had a substantial

presence in California, continued to be the determinative factor under Quill. The

Quill court explicitly acknowledged that for purposes of its commerce clause

analysis of the use tax collection obligation it was adopting the same bright-line

test of National Geographic and Bellas Hess, that it rejected in its due process analysis.

The court also recognized that retaining the bright-line test in the use tax context went against the trend of eschewing formalistic, inflexible rules, but observed that "not all formalism is alike." Quill 504 U.S. at 314. The court concluded that a bright-line demarcating when a state could impose a use tax obligation was consistent with fundamental commerce clause concerns about the effects of state regulation on the national economy.

> Like other bright-line tests, the Bellas Hess rule appears artificial at its edges: Whether or not a State may compel a vendor to collect a sales or use tax may turn on the presence in the taxing State of a small sales force, plant, or office. Cf. National Geographic Society v. California Bd. of Equalization, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977); Scripto, Inc. v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960). This artificiality, however, is more than offset by the benefits of a clear rule. Such a rule firmly establishes the boundaries of legitimate state authority to impose a duty to collect sales and use taxes and reduces litigation concerning those taxes. . . .
> Moreover, a bright-line rule in the area of sales and use taxes also encourages settled expectations and, in doing so, fosters investment by businesses and individuals. Indeed, it is not unlikely that the mail-order industry's dramatic growth over the last quarter century is due in part to the bright-line exemption from state taxation created in Bellas Hess.

Id. at 315-16.

Because it is undisputed that Irwin has a substantial physical presence in Washington, we conclude that the commerce clause does not prohibit the state from imposing on Irwin an obligation to collect the sales tax and because it is conceded that Irwin failed to do so, the state may properly assess against it the obligation to pay the amount due.

16

We turn next to the assessment of the B&O tax against Irwin. The parties agree that resolution of the issue turns on whether, as to its retail sales, Irwin has a substantial nexus with Washington. The dispute concerns whether the issue of "transactional nexus" is essential to establishing a substantial nexus. According to Irwin, "[i]f a transactional (sic) or activity does not have a transactional nexus with a state, the taxpayer will have succeeded in dissociating the disputed transaction or activities[,]" thereby disproving the existence of a substantial nexus. Br. of Appellant at 8, n.1. Irwin concedes that its wholesale activities have a transactional nexus with Washington but argues that its retail sales do not. This is so, it contends, because its retail sales and wholesale sales were completely independent of each other during the tax period.

DOR, on the other hand, contends that under modern commerce clause jurisprudence, establishing a transactional nexus is not essential to finding a substantial nexus. It argues "[t]here need not be a direct connection between Irwin's in-state activities and particular sales to impose business and occupation tax." Br. of Respondent at 29. Relying primarily on Avnet, DOR argues it is only necessary that "Irwin's in-state activities were significant in establishing and maintaining a market for its goods in this state." Br. of Respondent at 29.

Whether an out-of-state company has substantial nexus with Washington is a question of law reviewed de novo. Space Age Fuels, Inc. v. State, 178 Wn. App. 756, 762, 315 P.3d 604 (2013). Taxes are presumed valid and it is well settled that the taxpayer carries the heavy burden of establishing that no

substantial nexus exists. Accordingly, here, the burden is on Irwin to establish it is exempt from the disputed B&O tax assessment.

Irwin relies primarily on Norton and B.F. Goodrich Co. v. State, 38 Wn.2d 663, 231 P.2d 325 (1951), a case decided by our state supreme court a few months after Norton. As in Norton, B.F. Goodrich did substantial business within the taxing state. At issue was whether some of B.F. Goodrich's interstate sales were subject to the B&O tax. The court acknowledged that under Norton even "where a corporation has gone into a state to do local business by state permission, and has set up an office which performs service helpful to its competition for local trade ... this ... does not prevent it being tax-free with respect to sales separate and distinct from its local business." Id. at 672. The critical issue was whether the services rendered by the B.F. Goodrich's Washington offices were "decisive factors in establishing and holding" the Washington market. Id. To establish that certain interstate sales are "separate and distinct," the taxpayer has to show that it does not "channel business through a local outlet . . . ." Id. at 673. In other words, the state may not tax "the proceeds from sales with which the local outlet had nothing to do." Id. at 675.

Applying this test to the facts of the case before it, the B.F. Goodrich court concluded that the tax was impermissible as to those sales which arose from an order sent directly from a Washington customer to an out-of-state B.F. Goodrich office, which was filled and shipped directly to the customer from an out-of-state office. Id. at 673. But interstate sales which were connected to a Washington

office in anyway, even if only to approve or deny credit for the Washington customer, fell within the state's taxing authority.

Irwin contends that, like Norton, B.F. Goodrich is still good law and controls the outcome here. According to Irwin, its wholesale activities "had nothing to do" with its retail sales, thus, the proceeds from the latter are beyond the reach of Washington's taxing authority.

In response, DOR cites Avnet for the proposition that the foundation supporting Norton and B.F. Goodrich "ha[s] been eroded by subsequent precedent." Avnet, 187 Wn. App. at 445. It argues that the modern test for substantial nexus is whether the bundle of corporate activity "carried on within the state supported the taxpayer's ability to establish and hold a market for its in-state sales." Br. of Respondent at 24. According to it, "[n]o direct connection between Irwin's Washington activities and retail sales is required" to establish a sufficient nexus to lawfully impose a B&O tax. Id.

In Avnet, the company had a Washington office that engaged in building and maintaining its worldwide market. Employees at that office serviced accounts, developed and implemented new marketing programs, recruited new customers, and offered extensive engineering support. Avnet sought to dissociate two categories of sales, only one of which is relevant here.[3] In its

---

[3] Avnet's "drop-shipped" sales involve out-of-state customers placing orders with an out-of-state office but directing Avnet to ship the products directly to a third party in Washington. Avnet, 187 Wn. App. at 432. This scenario is not at issue in this case.

"national sales," Avnet customers placed orders from a location outside of Washington with an Avnet office also located outside the state, but received the orders at a Washington location.

The Avnet court rejected the argument that Norton and B.F. Goodrich controlled. It first expressed the view that "the United States Supreme Court has explicitly removed at least two of Norton's chief doctrinal underpinnings." Avnet, 187 Wn. App. at 446. The court cited Scripto, 362 U.S. 207, as rejecting the idea expressed in Norton, that mere lack of an interstate vendor's presence in a state was sufficient to insulate sales in that state from a tax. It also cited Complete Auto as rejecting the then prevailing concept that interstate commerce was immune from state taxation, a proposition upon which Norton relied. Instead, the court viewed later cases such as Gen. Motors Corp. and Tyler Pipe Indus., Inc. as demonstrating "a progressive broadening of the types of activities that may establish substantial nexus for purposes of state taxation of interstate commerce." Id. at 447. Relying on those cases, but particularly on Tyler Pipe, the court concluded that Avnet was liable for the B&O tax on all of its Washington sales because Avnet's marketing activities in Washington "all served the creation and maintenance of Avnet's market in Washington, as well as other locations." Id. at 448.

In Tyler Pipe, the company sold goods in Washington that were manufactured outside of the state. It maintained no office, owned no property, and had no employees residing in the state. Tyler Pipe solicited business in

20

Washington through executives whose offices were located out-of-state and by a firm, retained as an independent contractor, located in Seattle. The trial court upheld the constitutionality of Washington's B&O tax against Tyler Pipe's commerce clause challenge, concluding that the state had sufficient nexus to tax the company. The trial court found that the firm engaged in substantial activities that helped Tyler Pipe to establish and maintain its market in Washington.

On appeal to our state supreme court, the firm's activities, as found by the trial court, were summarized as follows:

> The sales representatives acted daily on behalf of Tyler Pipe in calling on its customers and soliciting orders. They have long-established and valuable relationships with Tyler Pipe's customers. Through sales contacts, the representatives maintain and improve the name recognition, market share, goodwill, and individual customer relations of Tyler Pipe.
>
> Tyler Pipe sells in a very competitive market in Washington. The sales representatives provide Tyler Pipe with virtually all their information regarding the Washington market, including: product performance; competing products; pricing, market conditions and trends; existing and upcoming construction products; customer financial liability; and other critical information of a local nature concerning Tyler Pipe's Washington market. The sales representatives in Washington have helped Tyler Pipe and have a special relationship to that corporation. The activities of Tyler Pipe's agents in Washington have been substantial.

Tyler Pipe v. Dep't of Revenue, 105 Wn.2d 318, 325, 715 P.2d 123 (1986).

Despite these extensive activities in support of its Washington market, Tyler Pipe argued, as Irwin does here, that any receipts "from sales of orders placed directly to it from its Washington customers should be exempted from Washington's B&O tax." Id. at 36. Our supreme court rejected the argument. The court determined

21

that "the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales." Id. at 323. It concluded this standard was satisfied because Tyler Pipe's "sales representatives perform any local activities necessary for maintenance of Tyler Pipe's market and protection of its interests...." Id. at 321. The U.S. Supreme Court affirmed. It "agree[d] that the activities of Tyler's sales representatives adequately support the State's jurisdiction to impose its wholesale tax on Tyler." Tyler Pipe, 483 U.S. at 251.

We agree with Avnet, that Tyler Pipe controls the analysis of whether a substantial nexus exists. Tyler Pipe, makes two things clear. First, for businesses with a presence in the taxing state, the fact that orders are received and filled out-of-state for delivery within the taxing state does not, by itself, immunize the sales from a B&O tax. And second, the activities that form the nexus with the taxing state need not be tied to specific sales, but instead need only generally support the out-of-state vendor's ability to establish and maintain a market for its goods in the taxing state. Applying those concepts to this case, it is evident that the requisite nexus exists to support Washington's imposition of the B&O tax on all of Irwin's retail sales.

Irwin's wholesale and retail sales each involved nutritional products. When Irwin started selling retail products to Washington consumers, it had already had invested considerable resources into its store presence in Washington. Senior

22

company employees had spent considerable amounts of time in Washington during the tax period at issue. They participated in new item presentation, category review, promotional planning, educating sales staff and trade show exhibitions. Irwin also engaged four marketing firms to aid in marketing its products in Washington. The firms engaged in a wide variety of activities with Irwin's wholesale customers, such as receiving product orders, attending retailer shows on Irwin's behalf and acting as an intermediary with Irwin's retailers on promotional programs and other business matter. As a result of these activities, Irwin became very familiar with Washington nutritional products market. It knew what types of products sold best and for what prices. Like the sales representatives in Tyler Pipe, Irwin gathered "virtually all their information regarding the Washington market" through its extensive wholesale marketing and sales apparatus. Tyler Pipe, 105 Wn.2d at 325.

Irwin claims that the lack of brand overlap shows that the wholesale and retail lines were unrelated. The argument is unpersuasive because it ignores that the packaging for nearly every Irwin product sold at a Washington grocery or drug store contained Irwin's phone number and/or email address and website address. The website provided information about Irwin Naturals' product line and how to obtain product samples. While it is likely that these sales resulted in visits to Irwin's website, it is undisputed that the sales resulted in phone inquiries from individuals who had purchased Irwin products from its wholesale customers. Irwin acknowledges receipt of the phone calls but points out that the callers were

23

directed back to the retailer. But the issue is not whether these calls resulted in specific sales but instead whether it shows that Irwin's wholesale activities were creating a market for its retail sales. The phone calls resulting from its wholesale sales show that it was.

Finally, Irwin's own marketing strategy establishes the symbiotic relationship between its wholesale activities and retail sales, with each supporting the other. The admitted goal was "to maximize the revenue of the sale of 'Dual Action Cleanse' over its product life" by eventually switching the product from retail to wholesale sales. Br. of Appellant at 14. Irwin claims that because the strategy "worked in the opposite direction," i.e., utilized its retails sales to promote its wholesale market, there is no substantial nexus between Washington and its retail sales. Reply Br. of Respondent at 9. But Irwin cites no authority that such a relationship between its in-state activities and interstate sales is insufficient to "adequately support the State's jurisdiction to impose its wholesale tax." Tyler Pipe, 438 U. S. at 251. Moreover, the record shows that despite making Dual Action Cleanse available to its retailers, Irwin continued to earn substantial revenue through its retail sales. Irwin cannot show that these sales were unrelated to its wholesale activities.

We conclude that Irwin has not borne its burden of showing that it should be exempt from imposition of Washington's sales and B&O taxes on all of it retail

24

sales for the alleged tax period. The trial court did not err in granting summary judgment in favor of DOR. [4]

Affirmed.

WE CONCUR:

_____

Spearman, J.

_____

_____

---

[4] Irwin argues that regardless of the merits of its constitutional claim, the former WAC 458-20-193 (2010) provides an additional basis for dissociation in addition to the common law issues of nexus. We disagree. The regulation, known as "Rule 193," set forth DOR's view of the parameters for Washington's B&O tax. Under the rule, a B&O tax is not assessed on sales of goods which originate outside this state unless the goods were received by the purchaser in this state and the seller had nexus. If a seller "carries on significant activity in this state and conducts no other business in the state except the business of making sales, this person has the distinct burden of establishing that the instate activities are not significantly associated in any way with the sales into the state." Former WAC 458-20-193(7)(c). Because we conclude that Irwin has failed to carry this burden, it is not entitled to relief under the rule.