FILED
COURT OF APPEALS
DIVISION II

2015 APR 28 AM 8:35

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| AVNET, INC., | No. 45108-5-II |
| Respondent/Cross Appellant, | |
| v. | PUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | |
| Appellant/Cross Respondent. | |

BJORGEN, A.C.J. — Avnet Inc. challenges the assessment by the Department of Revenue (Department) of business and occupation (B&O) tax on two categories of sales of goods delivered to Washington addresses. The trial court granted summary judgment to Avnet regarding one category of sales and to the Department regarding the other. The Department appeals, arguing that the B&O tax applies to all of Avnet's Washington-bound sales. Avnet cross-appeals, arguing that both the Department's own rules and the federal constitution's

commerce clause[1] prohibit the State from imposing the B&O tax on either of the disputed categories of sales.

Because the B&O statute and regulations subject both categories of Avnet's Washington-bound sales to the B&O tax consistently with the commerce clause, we reverse the grant of summary judgment to Avnet and remand for entry of judgment in favor of the Department. We otherwise affirm.

## FACTS

Avnet Inc., a New York corporation headquartered in Arizona, describes itself as "one of the largest distributors of electronic components, computer products and embedded technology serving customers globally." Clerk's Papers (CP) at 194, 424. All of Avnet's products ship from distribution centers outside Washington. During the period at issue here, however, Avnet maintained an office in Redmond, Washington with more than 40 employees, serving customers in Washington and eastern Idaho and conducting other activities related to market and product development.

Following an audit, the Department determined that Avnet had miscalculated the amount of B&O tax due[2] for 2003 through 2005 by improperly excluding two categories of sales of Washington-bound products described as "National Sales" and "Third Party Drop-Shipped Sales." CP at 195. The Department determined that Avnet owed, with interest included, $556,330 in back taxes from the audit period, $386,179 of which arose from the Washington-bound national and drop-shipped sales at issue here.

---

[1] U.S. CONST., art. I, § 8, cl. 3.

[2] Avnet paid B&O tax on all sales during the audit period of Washington-bound products in which its Redmond office directly participated, which amounts are not at issue here.

2

The national sales category involves transactions where an Avnet customer places an order from a location outside Washington with an Avnet sales office outside Washington, but directs Avnet to ship some or all of the products to one of the customer's Washington facilities. The drop-shipped sales category also involves an Avnet customer located outside Washington placing an order with an Avnet sales office outside Washington. In this type of sale, however, Avnet's customer directs Avnet to ship products to a third party located in Washington, generally the Avnet customer's own customer. Nothing in the record indicates that Avnet's Redmond office participated in soliciting or filling orders, investigating customer credit, or providing technical support to the end users in the specific sales at issue in this appeal.

After an unsuccessful administrative appeal, Avnet paid the contested amount under protest and filed this action in Thurston County Superior Court. Both parties moved for summary judgment. After hearing argument, the trial court granted Avnet's motion and denied the Department's as to the drop-shipped sales, but granted the Department's motion and denied Avnet's as to the national sales. The Department appeals and Avnet cross-appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

An appellate court reviews a grant of summary judgment de novo and performs the same inquiry as the trial court. *Macias v. Saberhagen Holdings, Inc.*, 175 Wn.2d 402, 407-08, 282 P.3d 1069 (2012). A party moving for summary judgment bears the burden of demonstrating that there is no genuine issue of material fact. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). A court should grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

The meaning of a statute is a question of law we also review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The "fundamental objective" of statutory interpretation "is to ascertain and carry out the Legislature's intent." *Campbell & Gwinn*, 146 Wn.2d at 9-10. Where a "statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Campbell & Gwinn*, 146 Wn.2d at 9-10. Such plain meaning "is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn*, 146 Wn.2d at 11-12. If "the statute remains susceptible to more than one reasonable meaning" after such inquiry, it is ambiguous and we must "resort to aids to construction, including legislative history." *Campbell & Gwinn*, 146 Wn.2d at 12.

The rules of statutory construction also apply to the interpretation of administrative regulations adopted pursuant to statutory authority. *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002). In this context, appellate courts "interpret[] a WAC provision to ascertain and give effect to its underlying policy and intent." *Cannon*, 147 Wn.2d at 56. "Rules and regulations are to be given a rational, sensible interpretation," and courts will not consider them "ambiguous simply because different interpretations are conceivable." *Cannon*, 147 Wn.2d at 56-57. As with statutes, courts do not generally apply canons of construction to unambiguous administrative regulations. *Cannon*, 147 Wn.2d at 57. Courts should, however, "avoid a literal reading of a provision if it would result in unlikely, absurd, or strained consequences." *Cannon*, 147 Wn.2d at 57.

4

"When its meaning is in doubt, a tax statute 'must be construed most strongly against the taxing power and in favor of the taxpayer.'" *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 842-43, 246 P.3d 788 (2011) (quoting *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992)). Courts presume, however, that taxes are valid. *Lamtec*, 170 Wn.2d at 843. A party challenging the imposition of a tax thus bears the burden of proving that some exemption applies. *Lamtec*, 170 Wn.2d at 843; RCW 82.32.180. Where a court finds ambiguity in a provision providing for a tax exemption or deduction, the court must strictly construe the provision *against* the taxpayer. *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149-50, 3 P.3d 741 (2000).

## II. THE DEPARTMENT'S APPEAL

We begin with the Department's appeal, which challenges the trial court's grant of summary judgment to Avnet as to the drop-shipped sales. The Department argues that under applicable statutes and regulations the drop-shipped sales are subject to the B&O tax. Avnet contends that the trial court correctly ruled that the B&O tax does not apply to its Washington-bound drop-shipped sales because Avnet did not receive the goods in Washington within the meaning of the Department's own regulations.[3] The Department is correct.

A. The B&O Statute and Implementing Regulations

Washington imposes the B&O tax "for the act or privilege of engaging in business activities" in the state. Former RCW 82.04.220 (1961);[4] *Lamtec*, 170 Wn.2d at 843. The statute

---

[3] As an alternative basis, Avnet argues that the trial court was correct in granting summary judgment, because the drop-shipped sales lacked the required constitutional nexus with Washington. In part III below, we conclude that constitutional nexus is present for both categories of sales.

[4] The legislature amended this provision in 2010, but the audit period here at issue predates that amendment.

requires "every person that has a substantial nexus with this state"[5] and who conducts activities here "with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly" to pay a percentage of the gross receipts of any resulting proceeds. Former RCW 82.04.220; RCW 82.04.140; *Lamtec*, 170 Wn.2d at 843.

For wholesale sales, the statute imposes "[u]pon every person engaging within this state in the business of making sales at wholesale" a B&O tax "equal to the gross proceeds of sales of such business multiplied by the rate of 0.484 percent." RCW 82.04.270. The statute defines "[s]ale" as "any transfer of the ownership of, title to, or possession of property for a valuable consideration." RCW 82.04.040(1). In interpreting this statute, our Supreme Court has held that "'the legislature intended to impose the business and occupation tax upon virtually all business activities carried on within the state,' and to 'leave practically no business and commerce free of . . . tax.'" *Simpson*, 141 Wn.2d at 149 (alteration in original) (quoting *Time Oil Co. v. State*, 79 Wn.2d 143, 146, 483 P.2d 628 (1971) and *Budget Rent-A-Car of Wash.-Or., Inc. v. Dep't of Revenue*, 81 Wn.2d 171, 175, 500 P.2d 764 (1972)).

In the drop-shipped sales, Avnet did not deliver the products to its own buyer outside Washington. Instead, it delivered the products to its buyer's customer in this state. Thus, the only transfer of possession of property to any buyer occurred within the State of Washington. Under the terms of RCW 82.04.040 and .270, read consistently with the interpretive principles noted above, this brought the drop-shipped sales within the reach of the B&O tax.

---

[5] Avnet concedes that its activities here give it substantial nexus with Washington, which the statute defines broadly. RCW 82.04.067.

This conclusion is supported by WAC 458-20-103 (WAC Rule 103),[6] which defines

when a sale takes place in Washington for tax purposes:

> [f]or the purpose of determining [B&O] tax liability of persons selling tangible
> personal property, a sale takes place in this state when the goods sold are delivered
> to the buyer in this state, irrespective of whether title to the goods passes to the
> buyer at a point within or without this state.

Again, Avnet did not deliver the products to its own buyer outside Washington. Instead, it

delivered the products to its buyer's customer in this state. Thus, the only delivery to any buyer

that occurred was within the state of Washington. Under both the definitions of "sale" in RCW

82.04.040's and WAC Rule 103's criteria for determining when a sale takes place in this state,

the drop shipped sales took place in Washington. Therefore, RCW 82.04.270 and WAC Rule

103 by their terms subject the proceeds of these sales to the wholesale B&O tax.

Avnet argues to the contrary from WAC 458-20-193(7) (WAC Rule 193(7)), which

provides:

> Washington does not assert B&O tax on sales of goods which originate outside this
> state unless the goods are received by the purchaser in this state and the seller has
> nexus. There must be both the receipt of the goods in Washington by the purchaser
> and the seller must have nexus for the B&O tax to apply to a particular sale. The
> B&O tax will not apply if one of these elements is missing.

WAC Rule 193(2)(d) specifies also that "'[r]eceipt' or 'received' means the purchaser or its

agent first either taking physical possession of the goods or having dominion and control over

them." Avnet contends that, regardless of its nexus with Washington, the wholesale B&O tax

does not apply to the drop-shipped sales because Avnet's customer, the wholesale buyer, did not

take physical possession of or exercise dominion and control over the goods in Washington; only

the retail customer, Avnet's buyer's customer, received the goods within the meaning of the rule.

---

[6] The relevant portions of the rules at issue have not changed since the audit period. We
therefore cite the current version.

Avnet's argument relies on one of the specific examples given in WAC Rule 193(11)(h):

> Company X is located in Ohio and has no office, employees, or other agents located in Washington or any other contact which would create nexus. Company X receives by mail an order from Company Y for parts which are to be shipped to a Washington location. Company X purchases the parts from Company Z who is located in Washington and requests that the parts be drop shipped to Company Y. Since Company X has no nexus in Washington, Company X is not subject to B&O tax or required to collect retail sales tax. Company X has not taken possession or dominion or control over the parts in Washington.

Avnet asserts that this example "specifically addresses" the type of transaction at issue here, positing itself as "Company Z," its buyer as "Company X," and its buyer's customer as "Company Y." Br. of Resp't/Cross Appellant at 8-10. Because the example states that "Company X has not taken possession or dominion or control over the parts in Washington," WAC Rule 193(11)(h), Avnet argues that its buyers do not receive the goods within the meaning of WAC Rule 193(7), and the wholesale B&O tax therefore does not apply to those transactions.[7]

This example, however, is not as apt as Avnet contends. First, it addresses the tax liability not of Avnet (Company Z), but of Avnet's buyer (Company X), a matter not at issue in this appeal. Second, the fact that Avnet's immediate customer (Company X) did not take possession of the products in Washington is not determinative. As noted above, the only buyer who took possession or delivery did so from Avnet and in Washington. Under RCW 82.04.270 and WAC Rule 193, that locates the sale in this state.

---

[7] Avnet points to a number of e-mails and internal memoranda, obtained from the Department through discovery, concerning proposed amendments to the rule, which documents Avnet asserts show that the Department itself recognized that WAC Rule 193 as written precludes application of the B&O tax to these transactions. At most, these documents show a concern among certain department staff that parties would rely on the disputed language in WAC Rule 193 to make the argument that Avnet makes here. Because such arguments apparently ran counter to the Department's position, the staff members suggested clarifying the rule to preclude parties from making them. Regardless, Avnet points to no authority suggesting that an agency's internal debates concerning possible amendments to a rule bear on a court's interpretation of the rule.

Avnet's approach also elevates form over substance in a way similar to that rejected by the court in *Chicago Bridge & Iron Company v. Department of Revenue*, 98 Wn.2d 814, 824, 659 P.2d 463 (1983):

> [Chicago Bridge & Iron] argues rigorously that it is immune from the B & O tax because the contract "procurement" activities occurred outside Washington, thus leading to the conclusion that no "sales" activities occurred in state. Such an argument ignores the practicalities of modern business practice. As many corporations engage in business and maintain branch offices in numerous foreign jurisdictions, it is not surprising that contracts are negotiated and signed at locations other than the jurisdiction for which the product is intended. Corporate convenience, however, is not controlling in the context of the incidence of a tax. Were it otherwise, substantial taxes could be avoided simply by consummating all contracts outside the borders of the taxing state.

(Internal citations omitted.) As in *Chicago Bridge & Iron*, corporate convenience in negotiating or contracting out of state cannot distract from the central facts establishing the location of sale: where the buyer took delivery and possession.

B.    Legal Effect of WAC Rule 193

A more profound infirmity in Avnet's argument, though, lies in the nature of WAC Rule 193 itself. "An 'interpretive rule' is a rule, the violation of which does not subject a person to a penalty or sanction, that sets forth the agency's interpretation of statutory provisions it administers." RCW 34.05.328(5)(c)(ii). WAC Rule 193 does not impose any sanction for noncompliance with its terms: it merely explains the Department's view of when a party must pay the tax. Thus, WAC Rule 193 is an "interpretive" rule. *See also Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 446-47, 120 P.3d 46 (2005) (discussing the difference between legislative and interpretive agency regulations).

Interpretative rules do not constrain the courts. Our Supreme Court held in *Ass'n of Wash. Bus.*, 155 Wn.2d at 447 (emphasis omitted) that interpretive rules

are not binding on the courts and are afforded no deference other than the power of persuasion. Accuracy and logic are the only clout interpretive rules wield. If the public violates an interpretive rule that accurately reflects the underlying statute, the public may be sanctioned and punished, not by authority of the rule, but by authority of the statute. This is the nature of interpretive rules.

More specifically, in *Coast Pacific Trading, Inc. v. Department of Revenue*, 105 Wn.2d 912, 917-18, 719 P.2d 541 (1986), our Supreme Court rejected an argument, similar to Avnet's, that the related rule governing international transactions, WAC 458-20-193C, exempted more sales from the B&O tax than the statute or the constitution required. Because the statute clearly aimed to tax imports and exports to the fullest extent constitutionally permissible, the *Coast Pacific Trading* court held that the language of the rule could not provide a broader exemption than the constitution required:

> The Department of Revenue cannot use Rule 193C to expand the tax immunity of exporters beyond the exemptions provided by statute or required by the constitution. The Legislature has allocated to the Department the authority only to establish procedural rules. The Department cannot contradict a substantive legislative enactment by administrative regulation.

105 Wn.2d at 917 (footnote omitted). More recently, we rejected an argument almost indistinguishable from Avnet's that a different example from WAC Rule 193(11) provided a broader exemption than the B&O statute or the dormant commerce clause[8] required. *Space Age Fuels, Inc. v. State*, 178 Wn. App. 756, 764-65, 315 P.3d 604 (2013), *review denied*, 180 Wn.2d 1010 (2014). Under our case law, WAC Rule 193 is an interpretive rule that cannot subtract from the force of the statute or WAC Rule 103, discussed above.

---

[8] From the federal constitution's grant to Congress of authority to regulate interstate commerce, the United States Supreme Court has implied a "dormant Commerce Clause," which prohibits "certain state taxation even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995).

No specific statutory exemption applies to the sales at issue here. Avnet instead relies entirely on its constitutional nexus argument, addressed below, and the plain language of WAC Rule 193. Under the precedents just discussed, however, the language of the rule can provide Avnet no more haven than the B&O statute does. As discussed, the B&O statute aims to tax interstate commerce almost as far as the dormant commerce clause permits: absent a specific statutory exemption, every party with the requisite nexus to Washington must pay it on every transaction occurring here. Former RCW 82.04.220; RCW 82.04.040, .140; *Coast Pac. Trading*, 105 Wn.2d at 917-18. Avnet's argument that the State may not tax the sales because Avnet's customer did not receive the goods in Washington under WAC Rule 193 must fail.

As the analysis above shows, under RCW 82.04.040, .270 and WAC Rule 103, Avnet's proceeds from the drop-shipped sales are subject to the wholesale B&O tax. Neither the terms nor the legal status of WAC Rule 193 call that conclusion into question.

### III. AVNET'S CROSS-APPEAL

A.     WAC Rule 193

Avnet cross-appeals the order on summary judgment ruling that its national sales are subject to the B&O tax. Avnet first contends that its national sales are exempt under a regulation that purports to exclude from taxation sales "'not significantly associated in any way with'" the taxpayer's activities in Washington.[9] Br. of Resp't/Cross-Appellant at 17-20. This argument relies on WAC Rule 193(7)(c), which warns that

> a seller [who] carries on significant activity in this state and conducts no other business in the state except the business of making sales . . . has the distinct burden of establishing that the instate activities are not significantly associated in any way with the sales into this state.

---

[9] Avnet advances the same argument as an alternative basis for affirming the summary judgment in its favor regarding its drop-shipped sales. We reject it for the reasons here articulated.

11

The rule goes on to give a nonexclusive list of circumstances that would establish that the B&O tax applies to certain sales. WAC Rule 193(7)(c)(i)-(vi). Avnet maintains that, with respect to the disputed sales, its Redmond office engages in none of the activities described, and that its "instate activities are [thus] not significantly associated in any way with the sales" at issue. Br. of Resp't/Cross Appellant 19 (quoting WAC Rule 193(7)(c)).

From this, Avnet argues that even if the dormant commerce clause does not exempt the disputed sales from the B&O tax, the plain language of WAC Rule 193 does. This argument fails because, as shown above, the language of this interpretive rule can provide Avnet no more haven than the B&O statute does, and the statute, subject to any express exemptions, aims to tax all sales that the commerce clause allows the State to reach. *Coast Pac. Trading*, 105 Wn.2d at 917-18. Avnet's claims of exemption must therefore succeed or fail on the merits of its constitutional arguments, to which we now turn.

B.    Constitutional Limits on the State's Taxing Power

A tax on an out-of-state corporation must satisfy both the requirements of the Fourteenth Amendment's due process clause and the commerce clause. *Quill Corp. v. North Dakota*, 504 U.S. 298, 305, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992). Due process requires only sufficient contacts between the corporation and the taxing state such that imposing the tax "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)). Avnet does not expressly argue that the tax at issue offends due process, basing its argument instead on the commerce clause.

The limits imposed by courts under the dormant commerce clause have changed significantly over time. *See Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179-84, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995) *and Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279-88, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977). Modern dormant commerce clause jurisprudence requires only that a state tax imposed on an out-of-state corporation (1) be "applied to an activity with a substantial nexus with the taxing State," (2) be "fairly apportioned," (3) be nondiscriminatory with respect to interstate commerce, and (4) be "fairly related to the services provided by the State." *Complete Auto Transit*, 430 U.S. at 279. The parties' dispute focuses on the substantial nexus requirement. Our Supreme Court has held that, to establish such nexus, the instate activities of an out-of-state company "must be substantial and must be associated with the company's ability to establish and maintain the company's market within the state." *Lamtec*, 170 Wn.2d at 851.

C.     Transactional Nexus and Dissociation

Avnet concedes that it has "taxpayer . . . nexus," or connections with Washington sufficient for the state to constitutionally tax its interstate business activities here. Br. of Resp't/Cross-Appellant at 19. The parties' dispute centers on "transactional nexus"; specifically, whether the dormant commerce clause allows Avnet to "dissociate" its Washington-bound national and drop-shipped sales by showing that its instate personnel played no significant role in those transactions. Br. of Appellant/Cross-Resp't at 13-27, 30-46; Br. of Resp't/Cross-Appellant at 2-9, 20-28.

Avnet argues that "states may impose a tax on interstate sales only if there is a substantial nexus between the seller's activities and the state <u>and</u> those activities are significantly associated with the sales at issue." Br. of Resp't/Cross-Appellant at 16 (citing *Allied-Signal, Inc. v. Dir.,*

13

*Div. of Taxation*, 504 U.S. 768, 778, 112 S. Ct. 2251, 119 L. Ed. 2d 533 (1992)). However, the authority Avnet cites for this proposition, *Allied-Signal*, does not support it:

> The principle that a State may not tax value earned outside its borders rests on the fundamental requirement of both the Due Process and Commerce Clauses that there be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Brothers Co.*, 347 U.S. at 344-45. The reason the Commerce Clause includes this limit is self-evident: In a Union of 50 States, to permit each State to tax activities outside its borders would have drastic consequences for the national economy, as businesses could be subjected to severe multiple taxation. But the Due Process Clause also underlies our decisions in this area. Although our modern due process jurisprudence rejects a rigid, formalistic definition of minimum connection, we have not abandoned the requirement that, in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax, *see Quill Corp.*, 504 U.S. at 306-08.

*Allied-Signal*, 504 U.S. at 777-78. This precedent shows that the taxing state must have a sufficient connection both to the taxpayer and the activity taxed, but it does not impose a requirement that the taxpayer's activities creating the requisite connection to the taxing state have some direct connection to the specific sales taxed.

Avnet contends, though, that *Norton Company v. Department of Revenue of State of Illinois*, 340 U.S. 534, 71 S. Ct. 377, 95 L. Ed. 517 (1951) and *B.F. Goodrich Company v. State*, 38 Wn.2d 663, 231 P.2d 325 (1951), control and do impose such a requirement. In *Norton*, a Massachusetts company with a branch office in Chicago challenged Illinois's imposition of a gross receipts tax on all of its Illinois-bound sales. 340 U.S. at 535-37. The *Norton* Court held that, notwithstanding the presence of the Chicago office, Illinois could not tax transactions where Illinois customers placed orders with Norton's Massachusetts office, which office filled them and delivered the goods directly to the buyer via common carrier. 340 U.S. at 539. These sales were "so clearly interstate in character that the State could not reasonably attribute their proceeds to the local business." *Norton* 340 U.S. at 539.

Our Supreme Court followed *Norton* in *B.F. Goodrich*, 38 Wn.2d at 673-76, where a New York corporation that conducted extensive sales activities in Washington challenged B&O tax assessments on various types of transactions, including sales of goods delivered to J. C. Penny stores in Washington. B.F. Goodrich's New York office received the orders directly and shipped the goods from outside Washington, without the Washington sales force's direct participation. *B.F. Goodrich*, 38 Wn.2d at 666. Following *Norton*, the court held that the dormant commerce clause prohibited Washington from taxing these sales. *B.F. Goodrich*, 38 Wn.2d at 674.

The Department does not dispute that this case involves facts "substantially similar" to those in *Norton* and *Goodrich*, and concedes that those cases have not been expressly overruled. Reply Br. of Appellant/Cross-Resp't at 5. Instead, it argues that subsequent dormant commerce clause precedents "have greatly expanded the scope of activities deemed relevant in determining whether an interstate sale is 'dissociated' from a taxpayer's business activities in the taxing state," and that these more recent precedents demonstrate that Avnet's activities in Washington create sufficient nexus for taxation of all its Washington-bound sales. Reply Br. of Appellant/Cross-Resp't at 5-13 (citing *Tyler Pipe Indus., Inc. v. Wash. Dep't of Revenue*, 483 U.S. 232, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987); *Standard Pressed Steel Co. v. Wash. Dep't of Revenue*, 419 U.S. 560, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975); *Gen. Motors Corp. v. Washington*, 377 U.S. 436, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964)).

As an initial matter, we note that *Norton*'s foundations have been eroded by subsequent precedent. For example, the *Norton* Court based its conclusion in part on a then-prevailing view that

> [w]here a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home

15

office for acceptance, filling, and delivery back to the buyer, it is obvious that the State of the buyer has no local grip on the seller.

340 U.S. at 537. The Court has long since rejected that view. *Scripto, Inc. v. Carson*, 362 U.S. 207, 210-13, 80 S. Ct. 619, 4 L. Ed. 2d 660 (1960). The *Norton* Court's reasoning also relied on the "immunity" from state taxation that interstate commerce then enjoyed. *Norton*, 340 U.S. at 538. The Court soundly rejected this immunity in *Complete Auto Transit*, expressly overruling precedents to the contrary. 430 U.S. at 288-89. Thus, the United States Supreme Court has explicitly removed at least two of *Norton*'s chief doctrinal underpinnings.

More to the point, the Department is correct that subsequent precedents have expanded the range of activities relevant to the substantial nexus analysis. In *General Motors*, the company challenged imposition of the B&O tax on various transactions, including sales of parts to independent dealers in Washington, which orders were placed with and filled from its Portland, Oregon office. 377 U.S. 443-46. The *General Motors* Court declined to look at particular transactions in isolation, instead considering whether General Motors could show that "the bundle of corporate activity" in Washington was not a "decisive factor[] in establishing and holding" the market for its goods here, and concluding that it could not. *Gen. Motors Corp.*, 377 U.S. at 447-48.

In *Tyler Pipe Industries*, the Court found sufficient nexus for imposition of B&O tax on all of Tyler Pipe's sales into Washington even though it

maintains no office, owns no property, and has no employees residing in the State . . . [and i]ts solicitation of business in Washington is directed by executives who maintain their offices out-of-state and by an independent contractor located in Seattle.

483 U.S. at 249, 251. The Court agreed with our Supreme Court that "'the crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are

16

significantly associated with the taxpayer's ability to establish and maintain a market in this state for the sales.'" *Tyler Pipe*, 483 U.S. at 250 (quoting *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 105 Wn.2d 318, 323, 715 P.2d 123 (1986)). Significantly, in the portion of its opinion affirmed by the United States Supreme Court, our Supreme Court rejected an argument very similar to Avnet's, that the portion of Tyler Pipe's sales attributable to orders placed directly with its main office were exempt from tax. *Tyler Pipe*, 105 Wn.2d at 326-27; *Tyler Pipe*, 483 U.S. at 250-51.

These precedents show a progressive broadening of the types of activities that may establish substantial nexus for purposes of state taxation of interstate commerce. They show that a state need not demonstrate a direct connection between a taxpayer's nexus-creating activities and particular sales into the state in order to tax those sales.[10]

D.     Avnet's Washington Activities and Its Market for the Taxed Sales

Although United States Supreme Court precedent does not require a direct connection between Avnet's activities in Washington and these specific sales, it does require some connection to sustain application of the B&O tax. To find that connection, both *General Motors*, 377 U.S. at 447-48, and *Tyler Pipe*, 483 U.S. at 250-51, looked to whether the taxpayer's instate activities were significant in establishing and maintaining a market for its goods in the state. The *Tyler Pipe* Court quoted with approval our Supreme Court's description of some of the activities, other than building or maintaining direct relationships with customers, held to give rise to sufficient nexus there:

_____

[10] Avnet further asserts that delivery by common carrier into the taxing state does not qualify as in-state activity for purposes of substantial nexus. This argument relies on *Quill Corporation*, 504 U.S. 298, which upheld on stare decisis grounds a rule that states may not impose a use tax collection duty on out-of-state sellers whose only contact with the taxing state is by mail and common carrier. The *Quill* Court, however, limited its holding to sales and use taxes, 504 U.S. at 314-15, robbing it of precedential force in this appeal.

17

Tyler Pipe sells in a very competitive market in Washington. The sales representatives provide Tyler Pipe with virtually all their information regarding the Washington market, including: product performance; competing products; pricing, market conditions and trends; existing and upcoming construction products; . . . and other critical information of a local nature concerning Tyler Pipe's Washington market.

483 U.S. at 249-50 (quoting *Tyler Pipe*, 105 Wn.2d at 325).

The taxpayer carries a heavy burden in showing the absence of such a connection. In *American Oil Company v. Neill*, 380 U.S. 451, 458, 85 S. Ct. 1130, 14 L. Ed. 2d 1 (1965), the Court described the burden as follows:

when a corporation, pursuant to permission given, enters a State and proceeds to do local business the 'link' is strong. In such instances there is a strong inference that it exists between the State and transactions which result in economic benefits obtained from a source within the State's territorial limits. The corporation can, however, exempt itself by a clear showing that there are no in-state activities connected with out-of-state sales.

Employees at Avnet's Redmond office concededly engaged in a wide variety of market research and product development activities aimed at building and maintaining the company's worldwide market. Those activities included the servicing of new and existing accounts by account managers and sales and marketing managers and representatives, the development and implementation of marketing programs, the recruiting of new customers, and extensive engineering support. Avnet's marketing materials give the contact information for the Redmond office. These activities all served the creation and maintenance of Avnet's market in Washington, as well as other locations. These activities lie at the core of the market sustenance which both *General Motors Corporation*, 377 U.S. at 447-48, and *Tyler Pipe*, 483 U.S. at 250-51, found sufficient for constitutional nexus. That nexus is present for both Avnet's national sales and drop-shipped sales into Washington.

CONCLUSION

Under the uncontroverted facts and governing legal standards, both Avnet's national sales and drop-shipped sales here at issue are subject to Washington's B&O tax. We affirm the trial court's grant of summary judgment to the Department as to Avnet's Washington-bound national sales. As to the drop-shipped sales, we reverse the grant of summary judgment to Avnet and remand for entry of judgment in favor of the Department. We otherwise affirm.

_____
BJORGEN, A.C.J.

We concur:

_____
WORSWICK, J.

_____
MELNICK, J.