**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| JUBITZ CORPORATION, | No. 57952-9-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

MAXA, J. – Jubitz Corp. appeals the trial court's order denying its appeal of a Business and Occupation (B&O) tax assessment from the Department of Revenue (DOR) and its claim for a refund.

During the audit period, Jubitz operated several fueling stations in Washington. Jubitz also participated in two large fuel networks, Pacific Pride and CFN. Jubitz issued fuel cards to qualified customers that allowed the customers to obtain fuel both at Jubitz stations and at other fueling stations in the Pacific Pride/CFN networks. Jubitz billed its fuel card users for the fuel obtained. Pacific Pride and CFN set the price of the fuel, but Jubitz was free to charge its fuel card users a different amount. Jubitz fuel card users also could obtain fuel from stations in other networks besides Pacific Pride and CFN.

In addition, fuel card users of other participants in the Pacific Pride/CFN networks could obtain fuel at Jubitz's stations. The participants billed their own fuel card users for the fuel obtained. Jubitz also accepted fuel cards at its stations from users from other networks besides Pacific Pride and CFN.

DOR's audit assessed B&O taxes at the retailing rate when Jubitz fuel card users obtained fuel at other stations and at the wholesaling rate when non-Jubitz fuel card users obtained fuel at Jubitz's stations.

Jubitz argues that (1) Jubitz fuel card users obtaining fuel from other Pacific Pride/CFN participants' fueling stations should be classified as a retail sale from those participants, and Jubitz should be taxed only for the amounts above the Pacific Pride/CFN price it charged its fuel card users under the service tax rate; (2) non-Jubitz fuel card users obtaining fuel from Jubitz fueling stations should be classified as retail sales from Jubitz and taxed under the retailing rate; and (3) even if DOR correctly taxed transactions involving Pacific Pride/CFN stations and fuel card users, Jubitz fuel card users obtaining fuel from networks other than Pacific Pride/CFN and fuel card users from other networks obtaining fuel from Jubitz stations should be taxed at different rates.

DOR argues that based on the terms of Jubitz's agreements with Pacific Pride and CFN, (1) when Jubitz fuel card users obtained fuel from other Pacific Pride/CFN participants' fueling stations, the transaction should be classified as a retail sale from Jubitz because Jubitz actually purchased the fuel from the participants and then immediately resold the fuel to its fuel card users; and (2) when non-Jubitz fuel card users obtained fuel from a Jubitz station, the transaction should be classified as a wholesale sale from Jubitz because Jubitz actually sold the fuel to the other participants, who then immediately resold the fuel to their fuel card users.

We hold that (1) Jubitz made retail sales to its fuel card users when they obtained fuel from other Pacific Pride/CFN fueling stations, because in those transactions Jubitz purchased the fuel from the fuel network participant at a price set by the fuel network and then resold the fuel to the Jubitz fuel card user at a price determined by Jubitz; (2) Jubitz made wholesale sales of

fuel to Pacific Pride/CFN participants when their fuel card users obtained fuel at Jubitz stations, because Jubitz sold the fuel to the participant at a price set by the fuel network and the participant then resold the fuel to its fuel card user; and (3) the tax treatment for transactions when Jubitz fuel card users obtained fuel from stations operated by other networks besides Pacific Pride and CFN and when Jubitz accepted fuel cards from networks other than Pacific Pride and CFN, is the same as the transactions involving Pacific Pride/CFN participants.

Accordingly, we affirm the trial court's order denying Jubitz's claim for a B&O tax refund.

## FACTS

*Background*

Jubitz is a company based in Portland, Oregon. Jubitz provides fleet services, which involves operating fueling stations and providing credit services to customers. During the January 1, 2010 through December 31, 2014 audit period, Jubitz operated seven fueling stations in Washington. The stations dispensed on-road fuel, including gasoline and diesel, off-road or dyed diesel, and diesel exhaust fluid. Jubitz accepted several different fuel cards at its gas stations, including Pacific Pride, CFN, Comdata, TCS, Voyager, Wex, T-check, EFS, and Fleet One.

*Jubitz Fuel Cards*

Jubitz issued fuel cards to certain qualified customers. The fuel cards allowed customers to obtain fuel from various gas stations and pay for the fuel at a later date through invoices issued by Jubitz. In order to receive a fuel card, Jubitz required their customers to complete a credit application and sign a credit agreement.

If Jubitz approved a customer's credit application, Jubitz entered into a "Motor Fuel Use Agreement" with the customer. Clerk's Papers (CP) at 526. The agreement stated that Jubitz

would set the price charged for each type of fuel the customer purchased, and that the price was subject to change by Jubitz.

Jubitz periodically invoiced its customers for fuel obtained through use of the fuel card. The invoices included fuel obtained from Jubitz locations and non-Jubitz locations, without any distinction between the two.

Jubitz's invoices contained no charges for "card services," "credit card services," or "advancing credit and servicing credit accounts." CP at 529. The invoices listed itemized fuel obtained by the user and charged the user per gallon of fuel obtained.

Jubitz participated in two large fuel networks: Pacific Pride and CFN. Jubitz had agreements with both Pacific Pride and CFN. Under these agreements, Jubitz fuel card holders could obtain fuel at other network stations and Jubitz would allow fuel card users from other network participants at their stations.

*Pacific Pride Franchise Agreement*

Under the Pacific Pride franchise agreement, Jubitz was required to purchase from other Pacific Pride franchisees fuel that Jubitz fuel card users obtained from those franchisees, called "foreign purchases." CP at 527. The price Jubitz paid to other franchisees for foreign purchases was set by Pacific Pride, called the "transfer price." CP at 527. But Jubitz could charge its customers whatever price it chose.

Other franchisees were required to pay Jubitz for fuel obtained at Jubitz stations by those franchisees' fuel card users, called "foreign sales." CP at 527. The price the other franchisees paid to Jubitz was set by Pacific Pride called the "retail transfer price." CP at 527.

Pacific Pride acted as a clearinghouse, facilitating payments to and from Jubitz and other franchisees. Pacific Pride debited Jubitz's account for foreign purchases and credited Jubitz's

account for foreign sales for transactions that took place during a billing cycle. In other words, Jubitz paid other franchisees for foreign purchases and the other franchisees paid Jubitz for foreign sales.

Pacific Pride entered into joint user agreements with non-Pacific Pride entities, which allowed Pacific Pride franchisees' fuel card users to obtain fuel from gas stations in other networks. Under these agreements, Jubitz also accepted fuel cards from other networks as payment at its stations.

*CFN Mutual Access Agreement*

Under the CFN mutual access agreement, other CFN participants agreed to make a standing offer to sell fuel to Jubitz when a Jubitz fuel card user obtained fuel from the station of another CFN participant, called "remote transactions." Ex. 19, at 12 (¶ 5.6); CP at 528. Acceptance of that offer occurred when the Jubitz fuel card users withdrew fuel. Jubitz then immediately resold that fuel to its fuel card users. Jubitz subsequently invoiced and collected payments from its fuel card users for the fuel withdrawn at other participants' stations.

Jubitz agreed to make a standing offer to sell fuel to any other CFN participant when their fuel card user accessed fuel from a Jubitz station, called "foreign transactions." CP at 528. Acceptance of that offer occurred when the other CFN participants' fuel card users withdrew fuel. The CFN participants then immediately resold that fuel to their fuel card users.

CFN determined the price Jubitz was required to pay to other CFN participants for remote transactions and the price other CFN participants were required to pay Jubitz for foreign transactions.

CFN acted as a clearinghouse, facilitating payments to and from Jubitz and other participants. CFN issued statements to participants that debited Jubitz's account for all remote

transactions and credited Jubitz's account for all foreign transactions. In other words, Jubitz paid other participants for remote transactions and the other participants paid Jubitz for foreign transactions.

Similar to Pacific Pride's joint user agreements, CFN entered into agreements with other entities to allow for those entities' fuel card users to obtain fuel at stations in other networks. And under these agreements, Jubitz accepted fuel cards from other networks as payment at its stations.

*DOR Audit*

In 2014, DOR selected Jubitz for a routine excise tax audit. The audit period was January 1, 2010, through December 31, 2014. The scope of the audit included transactions involving fuel cards, but not those transactions involving traditional credit cards like Visa.

Jubitz reported amounts received from fuel its customers obtained from non-Jubitz stations under the service and other activities B&O tax classification, and based the tax only on its markup from the Pacific Pride/CFN established price. Jubitz reported sales of fuel obtained at its stations by other Pacific Pride franchisees and CFN participants under the retailing B&O tax classification.

As a result of the audit, DOR determined that Jubitz should have reported sales to its fuel card users for fuel obtained at non-Jubitz locations under the retailing B&O tax classification based on the gross proceeds of sales instead of under the service and other activities B&O tax classification based on Jubitz's profit margin. DOR also determined that Jubitz should have reported its sales of fuel to fuel card users from other networks at Jubitz locations under the wholesaling B&O tax classification instead of the retailing B&O tax classification. The wholesaling tax rate is 0.484 percent, compared to the retailing tax rate of 0.471 percent.

Based on its findings, DOR issued a tax assessment of $435,979 for the audit period. Jubitz paid the tax assessment and commenced an action in the trial court seeking a tax refund of $264,574 of the assessed amount.

*Bench Trial*

The case proceeded to a bench trial. The trial court heard testimony from several witnesses and also considered multiple exhibits, including the agreements Jubitz executed with Pacific Pride and CFN.

The trial court issued detailed findings of fact and conclusions of law. The court concluded that Jubitz engaged in retail sales of fuel to its fuel card users when they obtained fuel at non-Jubitz locations. The court noted that Jubitz charged its fuel card users for the fuel obtained at non-Jubitz locations. And the court concluded that although Jubitz did not take physical possession of the fuel its fuel card users obtained at non-Jubitz locations, the Pacific Pride and CFN agreements dictated that Jubitz obtained constructive possession of the fuel obtained. Therefore, Jubitz's fuel card users obtaining fuel from non-Jubitz stations was subject to the retailing B&O tax.

Regarding fuel card users from other franchisees and participants obtaining fuel at Jubitz stations, the trial court concluded based on the Pacific Pride and CFN agreements that Jubitz sold fuel to other network participants, who then resold the fuel to their fuel card users. Therefore, the court concluded that Jubitz made wholesale sales to the other participants rather than retail sales to the fuel card users.

Based on its conclusions of law, the trial court denied Jubitz's claim for a tax refund. Jubitz appeals the trial court's order denying its claim for a B&O tax refund.

ANALYSIS

A.     STANDARD OF REVIEW

We review the trial court's decision after a bench trial to determine whether the substantial evidence supports the findings of fact and whether the findings of fact support the conclusions of law. *Real Carriage Door Co., Inc. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). Substantial evidence is the amount of evidence sufficient to convince a rational, fair-minded person that a premise is true. *Id.* All evidence and reasonable inferences are viewed in the light most favorable to the prevailing party. *Id.* We review the trial court's application of facts to law and the conclusions of law de novo. *Id.*

Here, Jubitz does not expressly assign error to any findings of fact.[1] And Jubitz only questions a few findings in the argument sections of its brief. Findings of fact that are unchallenged are treated as verities on appeal. *Id.*

B.     LEGAL PRINCIPLES

Washington levies B&O taxes on companies that engage in business in the state. RCW 82.04.220(1). One way of measuring B&O taxes is by gross proceeds of sales. RCW 82.04.220(1).

A "sale" is "any transfer of the ownership of, title to, or possession of property for a valuable consideration." RCW 82.04.040(1). The sale of tangible personal property to consumers is considered a "sale at retail." RCW 82.04.050(1)(a). However, a sale to a person who purchases tangible property for the purpose of resale is not a retail sale. RCW 82.04.050(1)(a)(i). The B&O tax rate for retail sales is 0.471 percent. RCW 82.04.250(1).

---

[1] Jubitz states its assignments of error, and then simply lists various findings of fact in parentheticals. RAP 10.3(g) states, "A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number."

A "sale at wholesale" is "any sale, which is not a sale at retail, of . . . tangible personal property." RCW 82.04.060(1)(a). The B&O tax rate for wholesale sales is 0.484 percent. RCW 82.04.270.

Any business activity that is not a sale at retail or a wholesale sale is taxed as a service or other activity. RCW 82.04.290(2)(a)-(b). The B&O tax rate for services or other activities is 0.275 percent. RCW 82.04.290(1).

We look to substance, and not form, when determining tax classifications. *Lowe's Home Centers, LLC v. Dep't of Revenue*, 195 Wn.2d 27, 33, 455 P.3d 659 (2020).

WAC 458-20-129 (Rule 129) provides that persons operating gasoline service stations are taxable under the retailing B&O tax classification.

C.     SALE OF FUEL TO JUBITZ FUEL CARD USERS AT NON-JUBITZ STATIONS

Jubitz argues that the trial court erred when it ruled that Jubitz made retail sales to Jubitz fuel card users when they obtained fuel at Pacific Pride/CFN fueling stations. Jubitz claims that it merely provided a service by extending credit to its fuel card users. We disagree.

The trial court determined that when Jubitz fuel card users obtained fuel from other Pacific Pride/CFN stations, Jubitz was making a retail sale of that fuel to its fuel card users. It is important to note that, unlike some tax cases that are resolved on summary judgment, here the trial court conducted a trial and issued findings of fact. Therefore, the question is whether the trial court's relevant findings of fact – which Jubitz mostly does not challenge – support its conclusion. *Real Carriage Door*, 17 Wn. App. 2d at 457.

Typically, a consumer obtaining fuel at a gas station would constitute a retail sale by the gas station. However, the agreements between Pacific Pride and CFN and Jubitz and the agreement between Jubitz and its fuel card users contemplate a different transaction.

1.    Pacific Pride Agreement

The trial court found that under the Pacific Pride agreement, (1) "Jubitz must purchase from other Pacific Pride franchisees the 'foreign purchases' made by Jubitz fuel card users at other franchisees' locations," CP at 527; (2) "[t]he price Jubitz must pay for foreign purchases is the 'transfer price' set by Pacific Pride," CP at 527; (3) Jubitz pays the other franchisees through a debit to its account by Pacific Pride; and (4) "Jubitz may charge its own fuel card user independently from Pacific Pride . . . whatever price it chooses," CP at 527.

Jubitz challenges only the fourth finding, claiming that the evidence does not support the finding.  However, paragraph 4 of the Motor Fuel Use Agreement, the agreement between Jubitz and its customers, discusses invoicing for fuel obtained, and then states, "The price charged by [Jubitz] for each type of fuel will be a reasonable price and may be changed from time to time by [Jubitz] to reflect market condition."  Ex. 507, at 1.  And paragraph 5.5 of the Pacific Pride agreement states, "PACIFIC PRIDE shall notify the FRANCHISEE of the Transfer Price and Retail Transfer Price for Foreign Purchases.  The FRANCHISEE shall use this information as it desires and *shall in all cases bill its Accounts at prices established by the FRANCHISEE independently from other PACIFIC PRIDE Franchisees and PACIFIC PRIDE*."  Ex. 6 at 100 (emphasis added).

Jubitz's Motor Fuel Use Agreement and the Pacific Pride agreement confirm that Jubitz sets the price for fuel obtained by fuel card users.  The trial court also found in an unchallenged finding, "Jubitz sets the price for each type of fuel."  CP at 526.  This unchallenged finding is a verity on appeal.  *Real Carriage Door*, 17 Wn. App. 2d at 457.

10

2. CFN Agreement

Regarding the CFN agreement, the trial court's findings do not directly address the treatment in the CFN agreement of Jubitz fuel card users obtaining fuel from other CFN participants. However, the trial court did find that the CFN fuel network operated similarly to Pacific Pride's network. And the court found that the CFN agreement provided that (1) Jubitz was deemed to have made a standing offer to sell fuel to another CFN participant whose fuel card user obtained fuel from a Jubitz location, (2) the offer was accepted when the fuel card user withdrew fuel, and (3) the CFN participant then immediately sold that fuel to its fuel card users.

The trial court did not expressly find that this process applied when Jubitz fuel card users obtained fuel from other CFN participants. But presumably the agreement was reciprocal: when Jubitz fuel cardholders accessed fuel from another CFN participant's location, that participant was deemed to have made a standing offer to sell fuel to Jubitz when Jubitz's fuel card user obtained fuel from their location. And Jubitz then sold the fuel to its fuel card users. The terms of the CFN agreement confirm that reciprocal arrangement.

The trial court also found that (1) Jubitz paid other CFN participants for remote transactions by its fuel card users through a debit to its account by CFN, (2) CFN determined the amount Jubitz paid to other participants, and (3) Jubitz was responsible for collecting payment from its own fuel card users for fuel obtained at other participants' locations. These findings confirm that the trial court's findings regarding other participants' fuel card users obtaining fuel from Jubitz locations also apply to Jubitz fuel card users obtaining fuel from other participants' locations.

3. Analysis

The trial court concluded under both the Pacific Pride and CFN agreements, Jubitz had constructive possession of the fuel obtained by its fuel card users at non-Jubitz locations. Therefore, Jubitz sold the fuel to its fuel card users. And Jubitz's consideration for selling that fuel to its fuel card users was the price Jubitz set and charged in its invoices to the fuel card users.

The trial court's findings regarding the CFN agreement clearly support the conclusion that Jubitz made a retail sale of fuel its card users obtained from CFN participants' stations. Jubitz expressly agreed in the CFN agreement that when Jubitz fuel card users obtained fuel from other Pacific Pride and CFN participants, Jubitz actually purchased the fuel from the participants at a price CFN established, and then in a simultaneous transaction Jubitz resold the fuel to its fuel card users at a price that Jubitz established. The consideration for the sale was the price Jubitz charged its fuel card users in its invoices. Therefore, the transactions at CFN participants' stations met the definition of a retail sale: "any transfer of the ownership of, title to, or possession of property for a valuable consideration." RCW 82.04.040(1).

The findings regarding Pacific Pride are less clear. But the key findings are that Pacific Pride set the price that Jubitz paid to the Pacific Pride franchisee and then Jubitz charged its fuel card user a higher price. These findings support the conclusion that Jubitz made a retail sale of fuel its card users obtained from Pacific Pride franchisees' stations.

4. Jubitz Arguments

First, Jubitz claims that it did not set the price of the fuel its fuel card users obtained. Instead, it simply added a fee for the various services it provided. However, the trial court expressly found that "Jubitz's invoices contain no charges for 'card services' or 'credit card

services' or 'advancing credit and servicing credit accounts' or similar language.  The invoices simply itemize all fuel withdrawn by the fuel card user and charges the user for each gallon of fuel withdrawn."  CP at 529.  This unchallenged finding supports the conclusion that Jubitz was charging its fuel card users only for the fuel obtained.

Second, Jubitz argues that it was extending credit to its fuel card holders to purchase fuel from non-Jubitz stations, not selling the fuel.  But the trial court's unchallenged findings of fact expressly state that under the Pacific Pride and CFN agreements, Jubitz paid the other participants for the fuel at a price set by Pacific Pride/CFN.  Jubitz then charged its fuel card users a price that Jubitz independently determined.  This arrangement does not constitute an extension of credit.

Third, Jubitz relies on *Rena-Ware Distributors, Inc. v. State* to argue that it merely was extending credit.  77 Wn.2d 514, 516-17, 463 P.2d 622 (1970).  In *Rena-Ware*, the taxpayer, a Washington corporation, sold products to customers nationwide.  *Id.* at 515.  When customers did not pay cash for their purchase, the taxpayer added a flat rate service charge to the purchase price.  *Id.*  DOR did not charge B&O taxes for sales made outside of Washington, but assessed taxes on the service charges because the servicing of accounts occurred in Washington.  *Id.*  The taxpayer argued that the service charge was part of the purchase price.  *Id.*  The Supreme Court held that the taxpayer's activity amounted to servicing installment accounts, not a retail sale.  *Id.* at 517.

However, *Rena-Ware* did not involve the taxation of the underlying sales.  The case involved the taxation of an additional service charge added to a purchase price, and in a completely different context than here.  *Rena-Ware*, 77 Wn.2d at 515.  And the case did not

13

involve a transaction where the taxpayer paid a third party for the products and then billed its customers at a different price.

Fourth, Jubitz relies on *Department of Revenue v. J.C. Penney Co.*, 96 Wn.2d 38, 633 P.2d 870 (1981). In *J.C. Penney*, the taxpayer issued credit cards to its customers and assessed a service charge if the customer did not pay the monthly balance. *Id.* at 40. DOR sought to impose B&O taxes on the service charge income. *Id.* at 41. The taxpayer argued that a tax could not be imposed because all activities relating to the service charges occurred in Oregon, not in Washington. *Id.* at 42. The Supreme Court acknowledged that servicing the taxpayer's account was taxable activity. *Id.* at 43-44. And the court concluded that certain activities in Washington subjected the taxpayer to Washington B&O taxes. *Id.* at 44.

As with *Rena-Ware*, *J. C. Penney* is inapplicable because it did not address the taxation of the underlying sales. The case involved the taxability of credit card service charges. *J. C. Penney*, 96 Wn.2d at 40-41. And the case did not involve a transaction where the taxpayer paid a third party for the products and then billed its customers at a different price.

Fifth, Jubitz argues that no evidence supported the trial court's conclusion that Jubitz had constructive possession of the fuel its fuel card users obtained from non-Jubitz locations. It argues that constructive possession requires that it be able to exercise dominion and control over the property to transfer it to another party, and the trial court did not make any findings that Jubitz had the ability to exercise dominion and control over the fuel owned by non-Jubitz stations.

However, we must consider substance over form when considering the tax classification of business activities. *Lowe's Home Centers*, 195 Wn.2d at 33. The trial court expressly found that Jubitz agreed to pay the Pacific Pride/CFN participants for the fuel obtained by Jubitz's fuel

card users, and then sold that fuel to its fuel card users. Therefore, Jubitz necessarily obtained constructive possession of the fuel that it purchased from the participants. That constructive possession allowed Jubitz to resell the fuel to its fuel card users.

We hold that the trial court did not err in concluding that Jubitz fuel card users obtaining fuel from non-Jubitz stations constituted retail sales by Jubitz.

D.    SALE OF FUEL TO PACIFIC PRIDE/CFN FUEL CARD USERS AT JUBITZ STATIONS

Jubitz argues that the trial court erred when it concluded that Jubitz made wholesale sales when Pacific Pride and CFN fuel card holders obtained fuel at Jubitz stations. Jubitz claims that it made retail sales to those fuel card holders. We disagree.

The trial court concluded that when fuel card users from other Pacific Pride/CFN participants obtained fuel from Jubitz locations, Jubitz sold the fuel to the participants, who then resold the fuel to its fuel card users. Therefore, the court concluded that Jubitz's sale of the fuel was a wholesale sale. As noted above, unlike some tax cases that are resolved on summary judgment, here the trial court conducted a trial and issued findings of fact. Therefore, the question is whether the trial court's relevant findings of fact – which Jubitz does not challenge – support its conclusion. *Real Carriage Door*, 17 Wn. App. 2d at 457.

Typically, a consumer obtaining fuel at a gas station would constitute a retail sale by the gas station. However, the agreements between Pacific Pride and CFN and Jubitz contemplate a different transaction.

1.    Pacific Pride Agreement

The trial court found that under the Pacific Pride agreement, (1) "other Pacific Pride franchisees must, through Pacific Pride, pay to Jubitz the price for 'foreign sales' made by other franchisees' fuel card users at Jubitz's locations at the 'retail transfer price' established by

Pacific Pride," CP at 527; and (2) the other franchisees paid Jubitz through a debit to their accounts and a credit to Jubitz's account. The trial court's findings do not directly address the process once Pacific Pride participants purchase the fuel from Jubitz. However, the court did find that "Jubitz may charge its own fuel card user independently from Pacific Pride or other franchisees whatever price it chooses." CP at 527. Presumably, this finding applies equally when Pacific Pride franchisees purchased fuel from Jubitz: the franchisee charged its fuel card user a price that it chose. The terms of the Pacific Pride agreement confirm that arrangement.

Jubitz does not challenge these findings, so they are verities on appeal. *Real Carriage Door*, 17 Wn. App. 2d at 457.

2. CFN Agreement

The trial court found that the CFN agreement provided that (1) Jubitz was deemed to have made a standing offer to sell fuel to another CFN participant whose fuel card user obtained fuel from a Jubitz location at a price determined by CFN, (2) the offer was accepted when the fuel card user withdrew fuel, (3) the CFN participant then immediately sold that fuel to its fuel card users, and (4) the other participants paid Jubitz through a debit to their accounts and a credit to Jubitz's account.

Jubitz does not challenge these findings, so they are verities on appeal. *Real Carriage Door*, 17 Wn. App. 2d at 457.

3. Analysis

The trial court's unchallenged findings regarding the CFN agreement clearly support the conclusion that Jubitz made a wholesale sale of fuel when fuel card users from CFN participants obtained fuel from Jubitz's stations. The findings show that when non-Jubitz fuel card users obtained fuel from Jubitz stations, Jubitz actually sold the fuel to the CFN participants, who in a

16

simultaneous transaction resold the fuel to its fuel card users. A sale to a person who purchases tangible property for the purpose of resale is not a retail sale. RCW 82.04.050(1)(a)(i).

Again, the findings regarding Pacific Pride are less clear. But the key findings are that Pacific Pride set the price that Pacific Pride franchisees paid to Jubitz and the implied finding is that the franchisees could charge its fuel card user a higher price. These findings support the conclusion that Jubitz made a wholesale sale of fuel to Pacific Pride franchisees when their fuel card users obtained fuel from Jubitz stations.

4.    Jubitz Arguments

First, Jubitz argues that it made retail sales to the Pacific Pride and CFN fuel card users under the plain language of RCW 82.04.050(1)(a). Jubitz claims that it made a sale of tangible property (fuel) to a consumer (fuel card user) that is using the fuel for a purpose other than resale (driving their vehicle) in exchange for valuable consideration (the price of the fuel). But this argument ignores the unchallenged findings of fact showing that the Pacific Pride/CFN participants, not the fuel card users, actually purchased the fuel from Jubitz. So the fuel card users did not provide valuable consideration to Jubitz – the participants did. And the actual buyer – the participants – purchased the fuel for the purpose of resale to their fuel card users.

Second, Jubitz points to Rule 129, which states that "[p]ersons operating gasoline service stations are taxable under the retailing classification." Jubitz argues that this rule requires that the transfer of fuel to non-Jubitz fuel card users be treated as retail sales. However, interpretive rules "sets forth the agency's interpretation of statutory provisions it administers." RCW 34.05.328(5)(c)(ii). Interpretive rules do not constrain the courts. *Avnet, Inc. v. Dep't of Revenue*, 187 Wn. App. 427, 439, 348 P.3d 1273 (2015). They " 'are not binding on the courts and are afforded no deference other than the power of persuasion.' " *Id.* (quoting *Ass'n of Wn.*

*Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 447, 120 P.3d 46 (2005)).  Interpretive rules "cannot subtract from the force of the statute."  *Avnet*, 187 Wn. App. at 440.

Here, the findings of fact establish that Jubitz sold the fuel to Pacific Pride/CFN participants, who resold the fuel to its fuel card users.  Under RCW 82.04.050(1)(a)(i), a sale to a person who purchases tangible property for the purpose of resale is not a retail sale.  Rule 129 cannot trump this clear statutory rule.

Third, Jubitz emphasizes that a majority of out-of-state network participants whose fuel card users obtained fuel from Jubitz stations did not register with DOR and did not report retail sales in Washington.  But how third parties calculate their tax liability cannot affect the nature of Jubitz's sales.

Fourth, Jubitz notes that it did not provide reseller permits to any of the participants to which Jubitz allegedly made retail sales.  The lack of a reseller permit did not bar the trial court from finding that Jubitz made wholesale sales to other fuel network participants.  There are other ways besides a reseller permit for showing that a sale was a wholesale sale.  RCW 82.04.470(5) states that a sale can be deemed a wholesale sale based on the "facts and circumstances."  *See Protective Admin.* Servs., Inc. v. Dep't of Revenue, 24 Wn. App. 2d 319, 327, 519 P.3d 953 (2022).  The trial court could and did examine the facts and circumstances of the sales transactions, specifically the Pacific Pride franchise agreement and the CFN mutual access agreement, when it concluded that Jubitz engaged in wholesale sales.

Fifth, Jubitz argues that DOR did not treat other taxpayers with fuel card programs in the same manner as it treated Jubitz and that DOR's auditor was inexperienced.  During the bench trial, DOR employee acknowledged that there were concerns both within DOR and among taxpayers about the consistency of tax treatment of companies in the fuel business.  And the

DOR auditor had never audited a company that issued fuel cards. However, Jubitz does not explain how these facts affect the trial court's findings and conclusions.

We hold that the trial court did not err in concluding that Jubitz made wholesale sales when Pacific Pride and CFN fuel card users obtained fuel at Jubitz gas stations.

E.      FUEL SALES INVOLVING OTHER NETWORKS

At oral argument, Jubitz argued that the trial court's conclusions regarding when Jubitz fuel card users obtained fuel from Pacific Pride/CFN stations do not apply when Jubitz fuel card users obtained fuel from stations in other networks or fuel card holders from other networks obtained fuel from Jubitz stations. We disagree.[2]

The trial court made findings of fact that the ability of Jubitz's fuel card users to obtain fuel from other networks' stations resulted from agreements that Pacific Pride and CFN executed with other card networks. The trial court also found that Jubitz accepted multiple cards other than those from Pacific Pride and CFN as payment at its stations, including Comdata, TCS, Voyager, Wex, T-check, EFS, and Fleet One. The court found that Jubitz accepted these other cards as the result of Pacific Pride/CFN "joint user and reciprocal access agreements." CP at 527.

The trial court's findings of fact and conclusions of law do not expressly address the payment arrangements when Jubitz fuel card users obtained fuel at other networks' stations or when other networks' fuel card users obtained fuel at Jubitz's stations. However, considering the findings as a whole, we can infer that the payment arrangements for in-network transactions applied to out-of-network transactions. In addition, the trial court made the following finding:

---

[2] Although this argument was not specifically raised in its opening brief, Jubitz's arguments against DOR's assessment were not limited to Pacific Pride/CFN transactions.

"Transactions involving joint users [Pacific Pride language] and extended transactions [CFN language] are tracked by the respective fuel network clearinghouses and appeared on the fuel networks' periodic statements to Jubitz alongside the other in-network transactions based on the applicable price." CP at 529. This finding implies that the payment arrangements for in-network transactions applied to out-of-network transactions.

The language of the Pacific Pride and CFN agreements supports this conclusion. The key payment provisions in the Pacific Pride agreement with Jubitz referred to "System Participants," Ex. 6 at 98-99, which was defined to include "Joint Users" – networks other than Pacific Pride. Ex. 6 at 8, 10. The key payment provisions in the CFN agreement with Jubitz referred to "Other Participants," Ex. 19 at 12-14, which was defined to include entities "between whom and CFN there is a mutual access agreement or other agreement permitting the settlement of Transactions in effect." Ex. 19 at 5.

It would have been helpful if the trial court's findings (prepared by DOR) had expressly addressed these issues. But Jubitz had the burden of proving its entitlement to a tax refund. RCW 82.32.180. When the trial court does not make a finding on a factual issue, we presume that the party with the burden of proof failed to sustain their burden regarding that issue. *In re Estate of Bussler*, 160 Wn. App. 449, 465, 247 P.3d 821 (2011).

We hold that Jubitz is not entitled to a tax refund for transactions when Jubitz fuel card users obtained fuel from stations in other networks or when fuel card holders from other networks obtained fuel from Jubitz stations.

CONCLUSION

We affirm the trial court's order denying Jubitz's claim for a B&O tax refund.

_MAXA, J._

MAXA, J.

I concur:

_CRUSER, C.J._

CRUSER, C.J.

PRICE, J. (dissenting) — The majority generally adopts the Department of Revenue's (DOR) characterization of the structure of Jubitz Corporation's relationship with its cardholders, other affiliated gas stations, and the clearinghouses of Pacific Pride and CFN. In doing so, the majority carefully sets out relevant portions of the Pacific Pride and CFN agreements and, generally speaking, accurately concludes these agreements support DOR.

But this is all form. And elevating form over substance, as our Supreme Court instructs, is not the appropriate approach for tax classifications. *See Lowe's Home Ctrs., LLC v. Dep't of Revenue*, 195 Wn.2d 27, 33, 455 P.3d 659 (2020). When fuel is sold to an end-user customer at a gasoline service station, it is a retail sale. WAC 458-20-129 (Rule 129). As this case illustrates, when credit is extended and affiliate networks become involved, fictional relationships can be created. And perhaps because they are fictional, the relationships can be described with conflicting terms, as they were here. For example, portions of the Pacific Pride agreements appear to contradictorily suggest that, on the one hand, gasoline service stations are selling each other fuel (supporting DOR's position) and, on the other hand, the service stations are merely selling "accounts receivables" (supporting Jubitz's position). *See* Ex. 6, at 99 (¶ 5.2 in "Exhibit A" to the "Pacific Pride Franchise Agreement").

The form of these fictional relationships may have relevance in other (nontax) contexts, but when we look at the substance of what is actually occurring, it is nothing unusual—an end-user customer buys fuel from a gasoline service station in a retail sale transaction, regardless of whether they are buying the fuel directly or on credit.

I respectfully dissent.

_____
PRICE, J.

22